UNITED STATES of America,
Plaintiff–Appellee,

v.

$506,231 IN UNITED STATES
CURRENCY, Defendant.

Nos. 96–3308, 96–3309 and 97–2282.

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1997.

Decided Sept. 3, 1997.

Jonathan C. Haile, Matthew D. Tanner (argued), Office of the United States Attorney, Civil Division, Chicago, IL, for Plaintiff–Appellee in Nos. 96–3308 and 96–3309.

Michele S. Schroeder (submitted), Office of the United States Attorney, Rockford, IL, for Plaintiff–Appellee in No. 97–2282.

Stephen M. Komie (argued), Brian E. King, Komie & Associates, Chicago, IL, Douglas W. Godfrey (argued), Chicago, IL, for Claimant-Appellant.

Before BAUER, HARLINGTON WOOD, JR., and MANION, Circuit Judges.

BAUER, Circuit Judge.

The United States Marshals Service currently possesses over half a million dollars which is claimed by Anthony Lombardo and Stephen M. Komie. The government filed a complaint for forfeiture of this currency pursuant to 21 U.S.C. § 881(a)(6). The district court granted summary judgment in favor of the United States, finding that there was probable cause to believe the money was subject to forfeiture. However, because the district court never properly obtained jurisdiction over the money, and neither the government nor the district court has sufficiently explained the requisite nexus between the money and drug or other criminal activity, we cannot affirm the district court's ruling. We therefore vacate and remand this case to the district court with directions to dismiss for lack of jurisdiction over the *res*.

### Background

On February 11, 1993, Sergeant Michael J. Thomas of the Chicago Police Department filed a complaint for search warrant in the Circuit Court of Cook County. The warrant issued based on information given by one Josue Torres, who had been arrested for burglary. Torres told Sergeant Thomas that he regularly sold stolen property at various places in Chicago in order to feed his crack habit. One of the places where he said he

fenced property was the Congress Pizzeria, located at 2033 N. Milwaukee Avenue in Chicago, Illinois, which is owned and operated by Claimant Anthony Lombardo. Torres said that he would bring the stolen property to the back door of the pizzeria where he would meet Sam or Frank Lombardo, Anthony's sons, haggle with them over the price, and eventually make the sale.

On February 11, 1993, Chicago Police conducted a search pursuant to the warrant at the pizzeria. The warrant authorized the police to search the pizzeria and Sam and Frank Lombardo, and to seize a camera, a snowblower, a television, and three VCRs. The police did not find these items during the course of their search; however, they did find and seize three unregistered guns and $506,076 in United States currency.[1] The money was found inside a forty-four-gallon barrel which was located inside either a boarded-up elevator or a dumbwaiter shaft, although the record is slightly unclear. It was wrapped in plastic bags and consisted of mostly small bills.

Frank Lombardo was present at the pizzeria at the time of the search. He was arrested and charged in the Circuit Court of Cook County with illegally possessing unregistered firearms. In the state court, Judge Patrick Morse suppressed the guns as evidence because he found that "it was not immediately apparent that the guns were contraband per se" and that "the guns were seized prior to the establishment of probable cause to seize them." Judge Morse reserved the question of whether there was probable cause to seize the currency because the question was not before him. No other state or federal criminal case was ever investigated or charged in connection with this alleged fencing operation or the Congress Pizzeria.

Pursuant to Illinois law, the Chicago Police, as an agent of the Clerk of the Circuit Court of Cook County, held the money until

---

1. The record is not entirely clear as to why discrepancies exist as to the amount of the seized currency. The Chicago Police report listing the seized items reported that $506,076 was seized. The government's initial complaint for forfeiture in this case referred to the amount seized as $506,231, but the government's amended complaint corrected the amount to $506,641 and indicated that the money had originally been under-counted by $410. We assume that the Chicago Police also made an error when they initially counted the money.

further order from that court. The currency was deposited in a commercial bank account. Anthony Lombardo filed a Motion for Return of Seized Property in the state court on March 10, 1993. On March 12, 1993, Anthony Lombardo assigned 15% of his interest in the *res* ($75,911.40) to his attorney, Claimant Stephen Komie. On March 16, 1993, the state court granted Lombardo's motion in part and denied it in part, and continued the matter of the disposition of the property to March 19, 1993. On March 19, the state court ordered the currency returned to Anthony Lombardo, and ordered the property custodian "not to transfer the property to any other persons or the United States." A check was then issued to Anthony Lombardo.

Meanwhile, on March 9, 1993, the United States had applied for a seizure warrant for the currency, pursuant to 21 U.S.C. § 881(a)(6).[2] The application for seizure warrant was supported by information contained in the affidavit of Special Agent Paulin of the Criminal Investigations Division of the IRS. Agent Paulin's affidavit basically restated the information given by Torres which was contained in Sergeant Thomas' complaint for search warrant. Agent Paulin's affidavit also included one reference to the presence of cocaine in a delivery truck outside the pizzeria. The government has admitted that this reference was not contained in Sergeant Thomas' complaint for search warrant, and also has admitted that it does not possess any Chicago Police reports indicating the presence of narcotics inside or outside the pizzeria. According to Agent Paulin's affidavit, one of the police officers present during the search of the pizzeria described Frank as "extremely distraught" and "visibly shaken when he was told that the money was being seized." The affidavit also states that, "[a]ccording to the police officers present, ... [Frank] offered no explanation for the huge cash horde. Several

hours later, Frank went to the police station and stated that the money belonged to his father, Anthony, who is currently in Florida." Magistrate Judge Edward A. Bobrick issued the seizure warrant on March 9, 1993, finding that probable cause existed to believe the money was subject to § 881(a)(6) forfeiture. That warrant was never executed, and it expired by its own terms on March 19, 1993.

On March 17, 1993, before the state court returned the money to Anthony Lombardo, the government filed a verified complaint for forfeiture of the currency pursuant to 21 U.S.C. § 881(a)(6). The complaint explicitly noted that the money was still in police custody. The complaint was also supported by Agent Paulin's affidavit. On March 18, 1993, the government filed an "Emergency Motion" in aid of the district court's jurisdiction. This motion indicated that Anthony Lombardo had filed a motion for the return of the currency in the Circuit Court of Cook County, and that the Assistant State's Attorney handling the case had advised the state court that a federal seizure warrant had been issued and that the state had no interest in detaining the funds. The government's emergency motion informed the district court that the state court would rule on Lombardo's motion the following morning at 11:30 a.m. It also addressed the government's concerns that "[i]f, pursuant to the state court's order, any of these funds are released and delivered to Mr. Lombardo and/or Mr. Komie, the funds could be disbursed or otherwise made unavailable for federal forfeiture, defeating this court's jurisdiction." The government asked the district court to order Anthony Lombardo and/or Stephen Komie to surrender to the United States Marshals Service any of the defendant funds they might receive from the Circuit Court of Cook County. In support of its request and its

---

2. Title 21 U.S.C. § 881(a)(6) authorizes the forfeiture of:

All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or

intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

21 U.S.C. § 881(a)(6).

argument that the district court had inherent power to issue orders effectuating its jurisdiction, the government cited the All Writs Act, 28 U.S.C. § 1651(a).

The district court granted the emergency motion on March 18, 1993. The government filed an amended verified complaint on March 19, 1993, which reiterated that the currency was still in police custody. On March 23, 1993, the district court entered a written order granting the government's emergency motion. The order provided that, following entry of any order in the state court case regarding the funds, and

> upon delivery of any portion of the seized property in the form of check(s) or any other form to Stephen Komie, Anthony Lombardo, or any other person or entity, in accordance with the state court's order, the seized property shall be delivered forthwith to the United States Marshal for execution of the warrant of seizure and monition issued in this case.

On March 29, 1993, Anthony Lombardo and Stephen Komie ("Claimants") both filed verified claims for restitution of the property with the district court. On April 5, 1993, Anthony Lombardo delivered the check he received from the state court to the United States Marshals Service.

On May 3, 1993, Claimants filed a joint motion to dismiss the complaint for lack of subject matter jurisdiction over the *res*. They argued that at the time the government filed its complaint for forfeiture, the district court did not possess the defendant *res* and, therefore, the district court had no jurisdiction over it. Rather, Claimants argued, the *res* was in the custody of the Circuit Court of Cook County and under the state court's jurisdiction. Claimants also argued that seizure of the *res* violated the Supplemental Rules for Certain Admiralty and Maritime Claims that govern seizures pursuant to 21 U.S.C. § 881. The district court denied Claimants' motion to dismiss on September 28, 1993 and found that it had not interfered with the state court's jurisdiction.

Claimants then filed a motion to suppress the currency, arguing that the seizure was unconstitutional because the Chicago police exceeded their authority under the warrant.

The district court denied the motion to suppress on April 22, 1994, finding that the money was seized pursuant to the plain view doctrine and that, because it was reasonable for the police officers to believe the currency might represent the proceeds from the sale of stolen property, the seizure was legally justified.

Claimants next filed another "motion to suppress," requesting the district court to conduct an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), because they believed the statements made by Sergeant Thomas in the complaint for search warrant were made falsely or with reckless disregard for the truth. On February 7, 1995, finding that Claimants had not made the requisite preliminary showing to warrant a *Franks* hearing, the district court denied this motion to suppress as well.

Finally, on May 9, 1996, the government filed a motion for summary judgment, arguing that there was probable cause to believe the currency was subject to forfeiture. In support of its motion, the government argued that Magistrate Judge Bobrick had already determined there was probable cause to find the currency subject to forfeiture. The government also argued that, because Anthony Lombardo had invoked his Fifth Amendment privilege against self-incrimination in response to one interrogatory when asked to explain the source of the money, Lombardo could not meet his burden of proof as to why the currency should not be subject to forfeiture. The district court granted summary judgment in favor of the government and against Claimants on July 11, 1996, and ordered the defendant $506,641 to be forfeited to the United States. The district court found that the government had satisfied its burden of establishing probable cause and that Lombardo's refusal to explain where the money came from and his "bald" denial of the government's charges was insufficient to defeat the motion for summary judgment. The district court denied motions to reconsider by both Claimants.

Claimants appeal from the grant of summary judgment and the denial of their mo-

tions for reconsideration. They argue (1) that the district court never properly acquired jurisdiction over the defendant res because the res was under the jurisdiction of the Circuit Court of Cook County; (2) that the district court erred in denying the motion to suppress evidence and the motion for a *Franks* hearing; and (3) that the district court erred in granting summary judgment in favor of the government and against Claimants. Claimants also argue that the forfeiture was disproportionate and therefore violative of the Eighth Amendment's prohibition against excessive fines.[3]

## Analysis

### A. Jurisdiction

 We review the district court's denial of Claimants' motion to dismiss for lack of jurisdiction over the *res de novo. United States v. One 1987 Mercedes Benz Roadster*, 2 F.3d 241, 243 (7th Cir.1993). Civil forfeiture actions are *in rem* proceedings. "Since the earliest days of the Republic the rule has been established that, when state and federal courts each proceed against the same res, 'the court first assuming jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other.'" *United States v. $79,123.49 in United States Cash and Currency*, 830 F.2d 94, 96 (7th Cir.1987) (citing *Penn General Casualty Co. v. Pennsylvania*, 294 U.S. 189, 195, 55 S.Ct. 386, 389, 79 L.Ed. 850 (1935)); *see also United States v. One 1979 Chevrolet C-20 Van*, 924 F.2d 120, 121 (7th Cir.1991). "The purpose of the rule is '[t]o avoid unseemly and disastrous conflicts in the administration of our dual judicial system, and to protect the judicial processes of the court first assuming jurisdiction.'" *$79,123.49*, 830 F.2d at 96 (citing *Penn General*, 294 U.S. at 195, 55 S.Ct. at 389). This rule does not apply to cases of concurrent in personam jurisdiction; in those cases, a state and a federal court may proceed simultaneously. *Id.* at 97 (citations omitted). However, the rule is applicable in *quasi in rem* and *in rem* actions. *Id.*

Our analysis in this case is controlled by our previous holding in *$79,123.49*. In that case, the defendant currency was seized during a drug transaction on June 15, 1984. On July 10, 1984, the state filed a civil complaint for forfeiture in Dane County Circuit Court in Wisconsin. On November 5, 1985, the state court dismissed the complaint because the state failed to abide by the time limitation provided by Wisconsin law. On December 16, 1985, the state court ordered the Clerk to turn the money over to the lawyer for one of the claimants. That order was stayed for ten days. The following day, December 17, 1985, while the stay was still in effect, the United States filed an action against the defendant currency in district court, pursuant to 21 U.S.C. § 881(a)(6). A seizure warrant was issued, and a United States Marshal took possession of the currency at the Dane County courthouse and placed it in an asset seizure fund account.

Thereafter, the state and federal cases continued on parallel tracks for a short period, with both courts asserting jurisdiction over the *res*. The state court directed the Sheriff of Dane County to seek return of the *res* from the United States Marshal unless the district court determined the federal courts had a superior claim to the *res*. The district court denied a motion to dismiss the action on the grounds that the state court had previously taken jurisdiction over the *res* and, instead, found that it had jurisdiction. We vacated and remanded the case to be dismissed for the district court's lack of jurisdiction over the *res*. *Id.* at 99. We concluded that both Wisconsin and the federal government were proceeding *in rem* and that Wisconsin had jurisdiction before the federal government. *Id.* at 97. We cited the rules from *Penn General* and other time-honored cases which require "'the court or its officer [to] have possession or control of the property which is the subject of the suit in order to proceed with the cause and to grant the relief sought.'" *Id.* (citing *Penn General*, 294 U.S. at 195, 55 S.Ct. at 389). We noted that the case presented "all of the logistical problems and potential for federal-state con-

---

**3.** Because we conclude today that the district court never properly exercised jurisdiction over the *res* and that the government did not establish probable cause, we need not reach the Eighth Amendment issue in this opinion.

flict inherent in two courts simultaneously competing for control of one res." *Id.* We therefore held that a federal court may not take jurisdiction over property seized by a federal agent prior to the termination of a state court proceeding involving the same res. *Id.* at 95. This holding has been followed by several of our sister circuits. *See, e.g., Scarabin v. Drug Enforcement Administration,* 966 F.2d 989, 994 (5th Cir.1992); *United States v. One 1985 Cadillac Seville,* 866 F.2d 1142, 1145 (9th Cir.1989); *see also Madewell v. Downs,* 68 F.3d 1030, 1041 n. 13 (8th Cir.1995).

We see no reason to depart from our analysis or holding in *$79,123.49* here. The district court did not possess or have jurisdiction over the *res* when it ordered Claimants to turn over the defendant currency to the United States Marshals. Instead, the district court's exercise of jurisdiction was in "conflict with the authority of the court having jurisdiction over the control and disposition of the property." *Penn General,* 294 U.S. at 198, 55 S.Ct. at 390 (citations omitted). The state court had possession and control over the defendant *res* at the very least until March 19, when it ordered the *res* returned to Claimants. The state court recognized its own jurisdiction in the March 19 order when it stated: "[T]his Court has jurisdiction over the subject matter of the seizure." More importantly, the state court explicitly exercised its own jurisdiction to the exclusion of the federal court and did not intend to transfer the property directly to the federal authorities. This is evidenced by the strong language the state court used in its March 19 order turning over the money to Claimants: "[T]he property custodian of the Chicago Police Department is *commanded* not to transfer the property to any other persons *or to the United States.*" (emphasis added). Therefore, the state court had jurisdiction over the control and disposition of the defendant currency, to the exclusion of the federal court, both when the government filed its warrant for seizure on March 9 and

when the government filed its compliant for forfeiture on March 17. Most significantly, the state court still maintained exclusive control and jurisdiction of the *res* on March 18, when the government filed its emergency motion in aid of jurisdiction and when the district court ordered the *res* turned over to the United States Marshals.

■ The government points out that in the state court, the Cook County Assistant State's Attorney informed Judge Morse that the State was not interested in pursuing forfeiture of the money and that, instead, the federal government had already instituted a forfeiture action.[4] We are not concerned with what the State's Attorney or the United State's Attorney told the state court about intending to proceed against the currency— we are concerned with which sovereign had jurisdiction. In its March 23 written order memorializing the March 18 order, the district court concluded that:

> [W]hile jurisdiction over the res is necessary to proceed against the property and secure its forfeiture, it is not necessary to have obtained such jurisdiction the moment the complaint for forfeiture is filed.... The initial warrant issued by the magistrate judge was not, nor could it have been executed while the seized funds were under the jurisdiction of the state court. Because we conclude that the property need not be under the Court's control the moment the complaint is filed, the lack of the ability to obtain such control either on March 17 or March 19 when the Government filed its complaint is irrelevant.

The district court is partially correct; the property need not be under the Court's control the moment the complaint for forfeiture is filed *if no one else is asserting jurisdiction over the control and disposition of the property.* But our case turns on the fact that the state court *was* exercising jurisdiction—and openly exercising it to the exclusion of the federal court. The state court's strong comments make it clear that it was not willing to

---

4. In fact, this actually seems to undercut the government's argument that there was probable cause to find the money forfeitable (see *infra*) since both logic and pragmatism inform us that if the state felt there was any legitimate nexus between the money and narcotics activities, it certainly would have pursued forfeiture of the money itself rather than handing it off to the federal government.

hand the property over on a platter to the federal authorities, and that makes all the difference.[5]

Strangely, both the district court and the Assistant United States Attorney ("AUSA") appear to have understood the applicable jurisdictional rules. On the morning of March 18, when the AUSA addressed the district court about the emergency motion, the very first comment she made was, "Your Honor, this is the United States' emergency motion regarding the five hundred and six some odd dollars [sic] in currency which was seized sometime in February, *which is now currently under State Court jurisdiction.*" (emphasis added). The AUSA also stated to the district court that morning:

> This Court cannot obtain jurisdiction over the defendant property until that property is seized by the United States Marshals and is taken into custody. That's what gives this Court jurisdiction. And then at that point we can discuss all of the-you know, any attorney's fees issue as far as the standing, as far as the probable cause with warrants, which I understand is one of Mr. Komie's concerns. There will be a forum for everybody, and we can discuss everything at that point. *But we need to get the money under this Court's jurisdiction.*

---

**5.** In addition, both the government and the district court believe that the forfeiture procedures set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules") also support their contention that the property need not be under federal jurisdiction the moment the complaint for forfeiture is filed. Again, however, both the district court and the government fail to acknowledge that the situation changes when another sovereign is actively and exclusively exercising jurisdiction over the res.

In *United States v. All Assets and Equipment of West Side Building Corp.*, 58 F.3d 1181, 1187 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 656 (1996), we described the three procedures by which the government may attach property through forfeiture proceedings: (1) following the procedure presented in the Supplemental Rules under § 881(b); (2) obtaining a court-ordered seizure warrant under Rule 41(c) of the Federal Rules of Criminal Procedure; and (3) seizing the property without judicial process "when the Attorney General has probable cause to believe the property is subject to civil forfeiture." 21 U.S.C. § 881(b)(4).

(emphasis added). After reviewing the transcript of March 18, we have found that the district court also understood the limitations on its own jurisdiction:

> My understanding of the current status of the law, and since I first visited it months if not years ago, it seems to have been reiterated, I mean, you cannot bypass the State Court if that is who has got the res, and they obviously do. And I suppose-I seem to have read in there it doesn't make any difference who is making [sic] claim or thinks that they got it or whatever. In order for there to be jurisdiction, the party who has it has to surrender it and give it over to somebody else rather than for me taking it away.

The district court's initial reaction was exactly correct—it did not have jurisdiction, nor could it bypass the state court's possession and control over the *res*.

▮ Despite its correct understanding of the limits on its jurisdictional authority, the district court nonetheless entered an order disposing of the property which it labeled "conditional." The district court suggested on March 18 that this "conditional" order was "innocuous" and "harmless" because it would only take effect if and when the state court relinquished jurisdiction over the funds. The district court can label the order anything it

Federal district courts have subject matter jurisdiction over civil forfeiture actions brought by the United States. *See* 28 U.S.C. §§ 1345 and 1355. The Supplemental Rules are applicable to civil forfeiture proceedings pursuant to 28 U.S.C. § 2461(b). The Supplemental Rules require a valid arrest of the property for an *in rem* action, and Supplemental Rule C(3) provides: "In actions by the United States for forfeitures for federal statutory violations, the clerk, upon filing of the complaint, shall forthwith issue a summons and warrant for the arrest of the vessel or other property without requiring a certification of exigent circumstances."

The district court found that "[s]uch a procedure clearly contemplates both the need and the power to bring the property alleged to be subject to forfeiture under the Court's control *after* the complaint is filed." The government agrees with this position, but as we said above, the fact that another sovereign was first exercising jurisdiction over the control and disposition of the *res* is crucial. In that scenario, the rule from *Penn General* applies.

likes, but the fact remains that no order in an in rem proceeding will have any force whatsoever if the court entering it does not have jurisdiction over the res.

■ In an attempt to defeat the obvious precedential mandate of the holdings in *$79,-123.49* and *Penn General*, the government also argues that because 28 U.S.C. § 1355 makes forfeiture actions "federal" in terms of subject-matter jurisdiction, the requirement of possessing the *res* does not apply. However, Claimants' argument, and our holding, is not that the district court does not have the *power* to hear forfeiture actions; but, rather, that the district court does not have power to issue orders in a forfeiture action while the defendant *res* is still under the jurisdiction of the state court. Calling an order "conditional," "innocuous," "harmless," or "contingent" does not confer this power. Nor is this power conferred by the fact that the March 18 order was merely a minute order, which was actually memorialized and entered on March 23, after the state court had returned the funds to Claimants. This is all irrelevant, because the district court was trying to assert jurisdiction over the res while it was still under the exclusive jurisdiction of the state court.

Both parties correctly assert that our decision today turns, at least in part, on our previous decision in *United States v. One 1979 Chevrolet C–20 Van*, 924 F.2d 120 (7th Cir.1991).[6] In *One 1979 Chevrolet C–20 Van*, we specifically stated that "[T]his case does not turn upon who won the forfeiture 'foot race' in the courts, but rather upon the fact that there is no authority for the type of transfer between executives of agencies that took place here." 924 F.2d at 122. Our case, rather, *does* turn on who won the foot race—not the race to the courts, but the race to obtain possession and control over the res—and clearly, the state court was the

victor. We stated in *One 1979 Chevrolet C–20 Van*:

> At the time the complaint was filed in federal district court, the state forfeiture action was pending and the state court had jurisdiction over the van to the exclusion of the federal court. The fact that the federal authorities muscled in on the van and began an administrative forfeiture proceeding before the state court action was filed did not confer jurisdiction on the federal court.

Although our facts are different than those in *One 1979 Chevrolet C–20 Van* because an actual "forfeiture action" was not pending in state court here, we are also faced with a case in which the federal authorities "muscled in" on state court proceedings in an attempt to improperly and prematurely get their hands on money. This kind of strong-arming is hardly permitted, not by common law, federal statutory authority or by our case law.

■ The district court attempted to distinguish *One 1979 Chevrolet C–20 Van* on the basis of the different method used to accomplish the transfer of the res from the state court to the federal court. The distinction is irrelevant. Whether the transfer happens covertly or via order from the district court is a distinction without a difference for subject-matter jurisdiction, something we value highly in our exercise of federal jurisdiction. As we indicated in *One 1979 Chevrolet C–20 Van*, the procedure which the government should have followed here was to seek a turnover order in the state court. *See also United States v. One 1987 Mercedes Benz Roadster*, 2 F.3d 241 (7th Cir.1993). The government may not simply assert jurisdiction over the *res* because it is concerned with losing money or having money disbursed. These concerns do not give either the government or the district court the right to improperly assert jurisdiction over property which is

---

**6.** In *One 1979 Chevrolet C–20 Van*, local police officers arrested the claimant and seized her van. Four days later, the police asked the FBI to initiate forfeiture proceedings. The FBI did so, and the police relinquished custody of the van to FBI agents. The claimant notified the FBI that she desired to contest the forfeiture, and the proceedings moved to federal court. 924 F.2d at 121. We held that the district court lacked juris-

diction to order forfeiture of the van because at the time the proceedings moved to federal court, a state forfeiture action was pending and the state court had jurisdiction over the van to the exclusion of the federal court. *Id.* at 123. We noted that under Illinois law, the local police could not simply turn over the van it had seized to the FBI; they were required to obtain an order from a state court. *Id.*

under state court jurisdiction or to circumvent the law of jurisdiction. Absent a turnover order in this case, the district court did not properly have jurisdiction over the defendant currency.

We also take this opportunity to point out that Claimants are not entirely off the mark in arguing that *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) required the district court to abstain from proceeding. The government asserts waiver, but jurisdictional matters can never be waived. Although we need not decide whether the *Younger* abstention doctrine applies here, we certainly recognize that concerns of federalism, comity and respect for sovereign power are important in this case.

## B. Probable Cause

■ Assuming arguendo that the district court properly exercised jurisdiction over the defendant *res*, we hold, alternatively, that the district court erred in granting summary judgment in favor of the government because the government failed to satisfy its initial burden of establishing probable cause. The record is utterly devoid of facts which would support the government's contention that it had probable cause to believe this currency was subject to forfeiture under 21 U.S.C. § 881(a)(6).

■ Under the forfeiture provision of the Comprehensive Drug Abuse Prevention & Control Act of 1970, 21 U.S.C. § 881, property used to commit a violation of the Act, including proceeds traceable to drug trafficking, are forfeitable. Of course, probable cause is required to initiate a forfeiture action. The probable cause threshold in a drug forfeiture case is the same as the probable cause threshold which is applicable everywhere else. *United States v. Edwards*, 885 F.2d 377, 389–90 (7th Cir.1989). The burden of proof is well-established—the government, as the party seeking the forfeiture, has the initial burden of establishing probable cause to believe the property is subject to forfeiture. *United States v. $87,118.00 in United States Currency*, 95 F.3d 511, 518 (7th Cir. 1996) (citing *United States v. All Assets and Equipment of West Side Building Corp.*, 58 F.3d 1181, 1187 (7th Cir.1995), *cert. de-*

nied, —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 656 (1996); *United States v. $94,000 in United States Currency*, 2 F.3d 778, 782 (7th Cir.1993)). To establish probable cause, the government must demonstrate a "reasonable ground for the belief of guilt supported by less than prima facie proof but more than mere suspicion." *$87,118.00*, 95 F.3d at 518 (citing *All Assets*, 58 F.3d at 1188); *see also United States v. On Leong Chinese Merchants Ass'n. Bldg.*, 918 F.2d 1289, 1292 (7th Cir.1990), *cert. denied*, 502 U.S. 809, 112 S.Ct. 52, 116 L.Ed.2d 29 (1991). Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of criminal activity. *United States v. Certain Real Property Commonly Known as 6250 Ledge Rd.*, 943 F.2d 721, 725 (7th Cir.1991) (citing *Edwards*, 885 F.2d at 389–90). The government may rely on direct evidence as well as on circumstantial and hearsay evidence. *All Assets*, 58 F.3d at 1188. Probable cause for the forfeiture exists if the government demonstrates a *nexus* between the seized property and illegal narcotics activity. *$87,118.00*, 95 F.3d at 518 (emphasis added) (citing *All Assets*, 58 F.3d at 1188 & n. 13; *Certain Real Property Commonly Known as 6250 Ledge Rd.*, 943 F.2d at 725). Once the government meets its burden of establishing the existence of probable cause, "the ultimate burden shifts to the claimant to prove by a preponderance of the evidence that the property is not subject to forfeiture" by demonstrating that the property was not used in connection with drug activities. *All Assets*, 58 F.3d at 1189 (quoting *$94,000*, 2 F.3d at 782–83). If the claimant fails to rebut the government's proof, the probable cause showing, standing alone, will support a judgment of forfeiture. *Id.* The claimant, of course, need not do anything to rebut the government's proof if the government's proof is insufficient to demonstrate the requisite nexus between the property and illegal narcotics activity.

In this case, we need not concern ourselves with the burden shifting from the government to Claimants; the government has not met its initial burden of proof. The government has not made any showing of a nexus between the money and narcotics-related ac-

tivities or any criminal activities that rises even slightly above the level of "mere suspicion." A brief view of the entire wealth of evidence that could possibly demonstrate any narcotics-nexus assures us that we are correct.

Both the district court and the government base their belief that probable cause exists on seven "undisputed" factors: (1) an unusually large amount of cash was found at the pizzeria; (2) this large amount of cash was in small bill denominations; (3) this large amount of cash was "unusually" stored; (4) to date, no one has identified a legitimate source of the currency or explained the reason for the currency's unusual storage; (5) three unregistered handguns were found on the premises; (6) an informant identified a large amount of cocaine being delivered to the pizzeria (more on this later); and (7) a trained drug dog identified traces of narcotics on the defendant currency. In our opinion, none of these factors alone can constitute probable cause, and even taking them as true and considering them all together, they still do not constitute probable cause.

First, none of the factors cited by the district court or the government concerning the amount of currency or the method of storing it have any bearing on the probable cause determination. The existence of any sum of money, standing alone, is not enough to establish probable cause to believe the money is forfeitable. *See, e.g., United States v. $5,000 in United States Currency*, 40 F.3d 846, 850 (6th Cir.1994); *United States v. $191,910.00 in United States Currency*, 16 F.3d 1051, 1072 (9th Cir.1994); *United States v. Baro*, 15 F.3d 563, 568 (6th Cir.) ("To date, this Court has not held that currency is contraband."), *cert. denied*, 513 U.S. 912, 115 S.Ct. 285, 130 L.Ed.2d 201 (1994); *United States v. $67,220.00 in United States Currency*, 957 F.2d 280, 285 (6th Cir.1992) ("[N]o court yet has held that the presence of a large sum of cash is sufficient, *standing alone*, to establish probable cause for forfeiture."). As far as we can tell, no court in the nation has yet held that, standing alone, the mere existence of currency, even a lot of it, is

illegal. We are certainly not willing to be the first to so hold. Absent other evidence connecting the money to drugs, the existence of money or its method of storage are *not* enough to establish probable cause for forfeiture under § 881.

Second, we do not consider any of the evidence of the handguns at the pizzeria as necessarily having anything to do with either narcotics activity or any other criminal activity. Even putting aside the fact that the state court suppressed the guns as evidence against Frank Lombardo, we have no reason to believe that the presence of handguns should necessarily implicate narcotics activity or that their presence need be seen as anything other than protection in a small business setting.

Third, the information from Torres and the affidavit of Agent Paulin do not establish a connection between narcotics and the money, or between narcotics and the pizzeria. The only reference to narcotics whatsoever in the complaint for forfeiture comes from uncorroborated and unsubstantiated double hearsay in Agent Paulin's affidavit.[7] Agent Paulin stated:

> The CI [Torres] related to police officers that he worked as a driver for the pizzeria up until a few months ago. At times he was also called upon to unload trucks delivering supplies and food to the pizzeria. Within the last year, the CI and another driver were requested to unload a truck delivering sausage. The other driver assisting the CI opened one of the sausage boxes and observed one pound of cocaine which he showed to the CI. The CI and the other driver split the cocaine between themselves.

There is no allegation by Torres or anyone else that cocaine was ever brought inside the pizzeria, but, rather, Torres allegedly told unnamed "police officers" that he and the other driver stole the cocaine. No allegations have been made that narcotics were used inside or at the pizzeria, that any narcotics transactions occurred inside or at the pizzeria, or that there was ever any money

---

**7.** We know that it is permissible to rely on hearsay, *All Assets*, 58 F.3d at 1188 & n. 12, we just do not believe that this hearsay is particularly reliable.

(much less the money in issue here) exchanged for narcotics inside or at the pizzeria. No arrest, federal complaint, or federal investigation into narcotics activities or other criminal activities has ever arisen in connection with Torres' statement to Sergeant Thomas or to these other "police officers." We find it highly significant that Torres' statement to Sergeant Thomas, which was memorialized in the complaint for search warrant in the state court, does not make any connection between narcotics and the pizzeria. In fact, Torres' statement to Sergeant Thomas does not contain any reference to narcotics whatsoever. The government admitted that the reference to narcotics in Agent Paulin's affidavit was not contained in Sergeant Thomas' complaint for search warrant, and the government also admitted that it did not possess any Chicago police reports indicating the presence of narcotics at or outside the pizzeria. Rather, the reference to cocaine did not show up in this case until the government filed its verified complaint for forfeiture on March 17. We can only assume that if information about narcotics were known to Sergeant Thomas, he would have included that information in his complaint for search warrant. Instead, Torres' statement to Sergeant Thomas only discusses the alleged fencing operation.

Finally, we are unwilling to take seriously the evidence of the post-seizure dog sniff. After the Chicago Police Department seized the money, a narcotics canine named "Rambo" was brought to the station (not the pizzeria) to check the money for the presence of drugs. Rambo was instructed to "fetch dope," and he grabbed one bundle of money from a table and ripped the packaging apart. That behavior apparently indicated the presence of drugs on the money. However, the dog only identified narcotics on one bundle of the seized currency even though the officers seized 31,392 separate bills in multiple bundles. Even the government admits that no one can place much stock in the results of

dog sniffs because at least one-third of the currency in the United States is contaminated with cocaine in any event.[8] Other recent cases have verified our belief that the probative value of dog sniffs is, at most, minimal. *See United States v. $53,082.00 in United States Currency*, 985 F.2d 245, 250 n. 5 (6th Cir.1993) ("[T]here is some indication that residue from narcotics contaminates as much as 96% of the currency currently in circulation") (citing *United States v. $80,760.00 in United States Currency*, 781 F.Supp. 462, 475 & n. 32 (N.D.Tex.1991)); *see also United States v. $5,000 in United States Currency*, 40 F.3d 846, 849 (6th Cir.1994); *United States v. Carr*, 25 F.3d 1194, 1214–18 (3d Cir.1994) (Becker, J., concurring in part and dissenting in part); *United States v. $639,558.00 in United States Currency*, 955 F.2d 712, 714 n. 2 (D.C.Cir.1992) (referencing expert testimony that 90% of all cash in the United States contains sufficient quantities of cocaine to alert a trained dog).

In sum, the government is unable to come up with the requisite narcotics-nexus to meet its initial burden of showing probable cause. Even at oral argument, the government's lawyer had difficulty explaining why the government attempted to go after this money. After repeated questioning, the most the government could offer as evidence of probable cause was the "existence of the money, combined with the evidence from the confidential informant, the firearms and whatnot." We have already explained why this evidence does not come close to showing any connection between the money and narcotics. The government conceded at oral argument that "the informant did not directly tie this money to any drug trafficking." The government then tried to claim that the tie between the money and drug transactions was "evidence that drug trafficking was going on, was being operated, out of the Pizzeria." As we have repeatedly explained, there is no evidence that drug trafficking was going on at the pizzeria. Therefore, *nothing* ties this

8. As Attorney Komie pointed out at oral argument, an American Bar Association Journal article described how Attorney General Janet Reno was subject to a canine-sniff and the bills in her purse triggered the dogs' response. *See Courts Reject Drug–Tainted Evidence*, 79 A.B.A. J. 22 (Aug.1993). The record in this case also contains the memo of a Drug Enforcement Agent chemist which states that the Federal Reserve rollers have been contaminated by cocaine, making the usefulness of dog sniffs limited.

money to any narcotics activities that the government knew about or charged, or to any crime that was occurring when the government attempted to seize the money.

 We reiterate that the government may *not* seize money, even half a million dollars, based on its bare assumption that most people do not have huge sums of money lying about, and if they do, they must be involved in narcotics trafficking or some other sinister activity. Moreover, the government may not require explanations for the existence of large quantities of money absent its ability to establish a valid narcotics-nexus. In response to the government's motion for summary judgment, Anthony Lombardo filed an affidavit in which he attested that he owned the money, that it was not furnished or intended to be furnished in exchange for controlled substances, and that it was not intended to be used to facilitate the exchange of controlled substances. He denied having any involvement with drugs or narcotics, and attested that the Congress Pizzeria operates only as a pizza parlor. But Anthony Lombardo did not have to go even this far, because the government provided absolutely no preliminary showing of probable cause. An owner does not have to prove where he obtained money until the government demonstrates that it has probable cause to believe the money is forfeitable. As we said in a much more notorious case than the one at bar, albeit not in the forfeiture context, "Property of private citizens simply cannot be seized and held in an effort to compel the possessor to 'prove lawful possession.'" *United States v. One Residence and Attached Garage of Anthony J. Accardo*, 603 F.2d 1231, 1234 (7th Cir.1979).

As has likely been obvious from the tone of this opinion, we believe the government's conduct in forfeiture cases leaves much to be desired. We are certainly not the first court to be "enormously troubled by the government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for the due process that is buried in those statutes." *United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 905 (2d Cir.1992).

## Conclusion

The judgment of the district court is VACATED and the case is REMANDED to be dismissed for lack of jurisdiction over the res. The district court should order the money returned to Claimants.