{¶ 27} I respectfully dissent because I do not agree with the majority when it states the trial court did not err when it "found that the State of Ohio had proven that the $17,000, found at Ermalene's home was connected with a felony drug abuse offense, as described in R.C.2925.43." I disagree with the majority's conclusion because the state did not prove its right to forfeiture by clear and convincing evidence. The state failed to establish a nexus between the $17,000 found in Ermalene's home and the drugs found in Curtis' car or, for that matter, any other felony drug abuse offense.
 {¶ 28} R.C. 2925.43 is Ohio's civil forfeiture statute, which, in part, provides as follows:
 {¶ 29} "(A) The following property is subject to forfeiture to the state in a civil action * * * and no person has any right, title, or interest in the following property:
 {¶ 30} "(1) Any property * * * derived directly or indirectly from any proceeds that a person obtained directly or indirectly from the commission of an act that * * * could be prosecuted as a felony drug abuse offense * * *;
 {¶ 31} "(2) Any property that was used or intended to be used in any manner to commit, or to facilitate the commission of, an act that * * * could be prosecuted as a felony drug abuse offense * * *."
 {¶ 32} R.C. 2925.43(E)(4) requires proof "by clear and convincing evidence, that the property in question is property as described in division (A)(1) or (2) of this section * * *." See also State v.Pringle (Mar. 5, 1999), Lucas App. No. L-98-1327; State v. Lyle,
(Oct. 29, 1997), Summit App. No. 18403; In re: Forfeiture of RealProperty Located at 952 Gilmore Street (Jan. 29, 1997), Ross App. No. 96CA2206.
 {¶ 33} In the case at bar, the complaint alleged two alternate theories: either the money was related to Curtis' arrest or its seizure was based upon a valid search warrant. The trial court concluded that the state's evidence was sufficiently clear and convincing to conclude that the $17,000 "came * * * from the commission of drug trafficking as Curtis Bridges has been convicted of."[2] The majority goes beyond the state's own theory of the case, however, and concludes that the evidence sufficiently proved "that the $17,000, which was found at Ermalene's home, was connected with a felony drug abuse offense, as described in R.C. 2925.43." According to the majority, the money does not have to be "directly tied to the convictions of Curtis and his girlfriend. * * * The state showed that Curtis was involved in drug trafficking, that his friend and girlfriend lived off and on in Ermalene's house, that cocaine residue was found in the garbage that came from Ermalene's house, and that the manner in which some of the money was found was consistent with the manner in which money was found during Curtis' arrest."
 {¶ 34} Thus the majority has departed from the specific crime for which he was convicted to a general drug offense as described in R.C.2925.43. Regardless of which nexus the majority is attempting to establish, I do not find sufficient evidence to support either position.
 {¶ 35} Under one theory, the state claims the $17,000 constitutes the proceeds of Curtis' illegal drug activity for which he was arrested on May 11, 2001. In support of this position, the state explained: "The state's burden was to show that the seized currency was sufficiently related to the drug trafficking of Curtis Bridges in complicity with Malika Poole and/or Clemmie Carter so as to provide the basis for the inference that the seized money was either used to further the drug trafficking or constituted the proceeds of such trafficking." State's appellate brief at p. 12.
 {¶ 36} Under an apparently alternate theory, the state's case rests upon a less developed argument for which it offers no legal support. The state claims that even if the $17,000 cannot be sufficiently related to Curtis' arrest on May 11, 2001, it is, nonetheless, still subject to forfeiture because the police had a valid search warrant when it was found. The state asserts that, "[a]lthough the seizing officers were aware of the prior arrest of Curtis Bridges and Malika Poole * * *there is no statutory requirement under 2925.43 that they link the moneyto that offense * * *. The currency in this case was seized pursuant to asearch warrant. The search warrant was based upon probable cause which included the discovery of cocaine in garbage from 19006 Longview on May 23 * * *." Emphasis added. State's appellate brief at p. 10. It is not enough, however, for the state to have shown probable cause for issuing the search warrant. The law of civil forfeiture requires a separate and distinct showing of probable cause under R.C. 2925.43. Any attempt to bootstrap the probable cause used to obtain the search warrant must additionally justify and meet the higher standard for forfeiture of the money found in the house during the search.
 {¶ 37} In Ohio, before a forfeiture is granted, the state must show a "sufficient nexus" between the property sought to be forfeited and a felony drug abuse offense. R.C. 2925.43(E)(4); In re: Forfeiture ofReal Property Located at 952 Gilmore Street (Jan. 29, 1997), Ross App. No. 96CA2206; In re Forfeiture of 1081 W. State St. (May 13, 1996), Columbiana App. No. 94-C-23, decided on other grounds ("the nexus between the criminal offense and the property in question" must be shown by clear and convincing evidence).
 {¶ 38} The standard of clear and convincing evidence requires that the proof produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. Cross v.Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118. As stated by the Ohio Supreme Court in State v. Schiebel (1990), 55 Ohio St.3d 71, 74-75,564 N.E.2d 54, "Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. Ford v. Osborne (1887), 45 Ohio St. 1, 12 N.E. 526, paragraph two of the syllabus.There is little Ohio authority on the meaning of "nexus" in the civil forfeiture context; however, there are federal forfeiture cases on what is a sufficient connection between property subject to forfeiture[3] and a specific criminal offense.[4]
 {¶ 39} The federal courts speak in terms of "probable cause," rather than the "nexus," described by Ohio courts. 952 Gilmore Street, supra; 1081 W. State St., supra. Nonetheless, the federal forfeiture cases are helpful in clarifying how strong the nexus between property and a felony drug abuse offense has to be before an order for civil forfeiture should be issued.
 {¶ 40} As held in United States v. $506,231 in United StatesCurrency (7th Cir. 1997), 125 F.3d 442, the state must satisfy its initial burden of establishing probable cause. As a threshold matter, the state must show that it had probable cause to believe the currency was subject to forfeiture. "Probable cause is defined as facts and circumstances which would lead (by inferences) a prudent person to believe that a crime was committed and that the subject of the investigation was connected with the crime." Brinegar v. United States,338 U.S. 160, 175-76, 93 L.Ed. 1879, 69 S.Ct. 1302 (1949); see UnitedStates v. $83,320 in United States Currency (6th Cir. 1982), 682 F.2d 573,577, quoting United States v. $22,287.00 in United States Currency
(E.D.Mich. 1981), 520 F. Supp. 675, 678.
 {¶ 41} As set forth in U.S. v. $30,000 In United States Currency
(6th Cir. 2002), 2002-U.S.-2918, there must be something specifically tying the money, or the person from whom it is seized, to the drug trade. At 30-31. Further, "[p]robable cause sufficient to justify forfeiture is a `reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion.'" United States v.$22,287.00, U.S. Currency, 709 F.2d 442, 446 (6th Cir. 1983).
 {¶ 42} Once the government meets its burden of establishing probable cause, "the ultimate burden shifts to the claimant to prove by a preponderance of the evidence that the property is not subject to forfeiture" by demonstrating that the property was not used in connection with drug activities. United States v. $67,220.00 in U.S. Currency, (6th Cir. 1992), 957 F.2d 280, 287. However, if the government's proof is insufficient to demonstrate the requisite nexus between the property and illegal narcotics activity, there is no need for any rebuttal. U.S. v.$30,000, supra.
 {¶ 43} The "existence of any sum of money," "evidence of handguns," and "evidence of post-seizure dog sniff," when considered alone or in combination with each other, are insufficient to establish the required showing of a relationship to narcotics. $506,231, supra, at 451-54.
 {¶ 44} In the case at bar, the state describes the particular evidence it believes supports forfeiture of the $17,000 as follows:
 {¶ 45} "The subject money in this case carried a strong scent of narcotics and the dog's reaction was violent to the extent that he had to be stopped by his handler from destroying clothes in the closet attempting to get to the shelf. * * * From garbage taken from the same house * * * additional cocaine residue was found. The subject money was wrapped identically as other money found in Curtis' vehicle in which he transported ten kilos of cocaine. The money from the vehicle seizure was wrapped in the same manner as the house money with black rubber bands distinctively indicating the same specific amounts in each location." State's appellate brief p. 13.
 {¶ 46} In this description the state offers three types of nexus evidence to support its petition for forfeiture of the $17,000. First, the state contends that, because Officer Burton's narcotics-trained dog led police to Bridges' closet, where the dog became excited, the money found there has to be related to drugs. In response, Bridges argues that the trial court could not reasonably infer from the dog evidence that the currency was connected to drug activity, because such evidence is not reliable. I agree with Bridges that the probative value of dog sniffs is, at most, minimal and an insufficient basis upon which to claim probable cause for the forfeiture of property.
 {¶ 47} In United States v. $5,000 in U.S. Currency (6th Cir. 1994), 40 F.3d 846, the circuit addressed the unreliability of using narcotics-trained dogs in drug cases. The court relied on studies showing that most currency in this country is tainted with traces of narcotics. The court found "the evidentiary value of the narcotics dog's alert to be minimal." Id. at 849. The court reversed the order of forfeiture because there was little other evidence to connect the currency to drug activity. Id. at 850; See United States v. $53,082.00 in United StatesCurrency (6th Cir. 1993), 985 F.2d 245, 250 citing United States v.$80,760.00 in United States Currency (N.D.Tex. 1991), 781 F. Supp. 462,475 n. 32 ("There is some indication that residue from narcotics contaminates as much as 96% of the currency currently in circulation"); see also United States v. $5,000 in United States Currency (6th Cir. 1994), 40 F.3d 846, 849; United States v. Carr (3d Cir. 1994),25 F.3d 1194; United States v. $639,558.00 in United States Currency
(D.C. Cir. 1992), 293 U.S. App. D.C. 384, 955 F.2d 712, 714 (according to expert testimony, 90% of all cash in the United States contains sufficient quantities of cocaine to alert a trained dog).
 {¶ 48} On the record before this court, Officer Burton's testimony highlights the specific type of reliability problems that are inherent with the use of specially trained drug dogs. Officer Burton testified that Bridges' closet was filled with clothes and that, even though money was found inside, he could not be exactly sure what it was that alerted the dog to the closet. The officer was uncertain whether the dog was reacting to a narcotic's odor on the clothes or an odor on the money. He conceded that the dog could have been reacting to an odor left on clothing from marijuana smoke.
 {¶ 49} The officer's testimony in this case makes it easy to infer that if clothing inside the closet possessed a narcotics odor, over time, that same odor would leech out onto anything else in that closet, including money. That odor could also affect the money the dog later located after it had been hidden from him in a drawer at the police station. Further, absent from the record are any facts explaining the chain of custody for the money after it was removed from Ermalene's home.[5] The evidence of the dog, therefore, cannot support the claim that the money found in Bridges' closet is connected to the drugs Curtis was arrested for possessing in May 2001 or to any other felony drug abuse offense.
 {¶ 50} The state also claims that the piece of paper taken from Bridges' garbage, which tested positive for cocaine, shows probable cause for the forfeiture. Whereas the residue meets the probable cause standard for a search, it does not meet the standard for forfeiture. The warrant says the residue was retrieved from garbage on the tree lawn at the premises. First, garbage left on the tree lawn available to any passerby is hardly sufficiently reliable to establish a nexus. Second, such a small amount, .01, would show only use, not trafficking, and the amount of cash found in the house is not consistent with mere drug use. More importantly, this residue was retrieved on May 23, 2001, but defendant had been in jail since May 11th. Tr. 42. Since he was not present at the house for twelve days, it cannot be established that defendant is even connected to this residue.
 {¶ 51} Furthermore, there is no evidence as to how long the paper was in the garbage, where it was before it became part of the trash from that house, or how it is connected to the money found in Bridges' closet[6] or to Bridges himself. Accordingly, the piece of paper has no probative value in the state's ability to establish a nexus between the money in the closet and a felony drug abuse offense in this case.
 {¶ 52} Moreover, no drugs or narcotics-related items were found inside the house during the police search. The search warrant claimed the following evidence of criminal offense would be found on the premises: "cocaine, and other narcotic drugs and/or other paraphernalia used in the taking of drugs for sale, use or shipment, records of illegal transactions * * *. Contraband including but not limited to money, guns, scales, plastic bags, cigarette rolling papers, computers, computer software, answering machine tapes, video tapes * * *." Of this list, only money was found. There was no evidence of packaging parapheralia, such as scales or plastic bags or diluents. In short, there was no evidence of drug trafficking in the house or that the house was used in the preparation of drugs for distribution. Without drugs or other evidence of illegal drug-related activity being found during the search, there is no "felony drug abuse offense" as required by the forfeiture statute, R.C.2925.43.
 {¶ 53} Nor could the nexus with the cash found in the house be based on the cash in Poole's purse and drugs found in the car when it was seized. The petition for forfeiture alleges the money "was either used to commit and/or facilitate the commission of an act that may be prosecuted as a felony drug abuse offense, or was derived directly or indirectly, from the commission(s) of an act(s) that may be prosecuted as a felony drug abuse offense." The money in the house could not have "derived" from the sale of the drugs in the car since they were not yet distributed. Finally, the money could not be logically deemed to have been used tobuy the drugs, since the drugs were already in his possession. Thus it is a leap to conclude the nexus is between the money found in the house and the drugs found in the car.
 {¶ 54} Finally, the state and the majority claim a nexus based on the money in Poole's purse when the car was seized and the money in the house. The state claims that "[t]he money from the vehicle seizure was wrapped in the same manner as the house money with black rubber bands distinctively indicating the same specific amounts in each location." The evidence, however, does not support such a claim. One of the officers testified that the rubber bands could be used "for braids or something along that nature." Tr. 58. Although one officer testified such rubber bands were distinctive to the drug trade, he also admitted they could be used "for braids or something along that nature." This admission belies the claim they were unique to the drug trade. In themselves, therefore, the black rubber bands cannot provide the nexus.
 {¶ 55} Moreover, the testimony regarding the rubber bands is contradictory. At trial, Officer Curtis described the money found in Poole's handbag on May 11th as follows: Of the $3500, $3000 of it was separated into three different black rubber-banded packets. The other $500 was secured with a beige rubber band. On May 23rd, twelve days after Curtis and Poole's arrest, when Officer Burton looked inside the bags of money found at the house he noticed how they were wrapped and testified that "[m]ost of them was folded in half, either rubber banded or justfolded inside the bag." Tr. 58, emphasis added. There is no evidence as to how much of the cash, as it was originally found, was simply folded rather than rubber-banded. Only Exhibit 16, a photograph, shows exactly how the money was found at the house, secured with rubber bands. The bands that are visible, however, are all beige-colored; there are noblack rubber bands, which the state claims links the $17,000 with that found in Poole's purse.[7]
 {¶ 56} Moreover, although Officer Burton testified that some of the money found in the closet was not rubber-banded, photo Exhibit 17, which is supposed to be "the $10,000 that was found in * * * Bridges' bedroom,"[8] shows fourteen piles of money, all of which are wrapped with either black or beige-colored rubber bands.
 {¶ 57} Comparing what is shown in Exhibit 17 with Officer Burton's testimony, it is clear that by the time Exhibit 17 had been photographed, some portion of the money had been altered from its original state; that is, someone had to have counted out the loose cash into different piles and then rubber-banded them. The state's own evidence either fails to support or contradicts its claim that the Longview house money was wrapped in a manner unique and identical to the currency found in Poole's purse.
 {¶ 58} The state claims further that Bridges' mother failed to sufficiently explain where the $17,000 came from. It is well settled, however, that owners do not have to prove where they obtained money until the government demonstrates that it has probable cause to believe the money is forfeitable. U.S. v. $30,000, supra; United States v. OneResidence and Attached Garage of Anthony J. Accardo (7th Cir. 1979),603 F.2d 1231, 1234. Bridges' explanation, or the absence of it, has no bearing on whether the state first satisfied its burden of showing a nexus between the property sought to be forfeited and a felony drug abuse offense.
 {¶ 59} From the record in this case, I do not find evidence establishing the required nexus linking the money to a felony drug offense. Further, there is no evidence when, if at all, Curtis or Poole had been at the Longview house before they were arrested. The record does not indicate that either of them returned to the house between May 11th and the 23rd, when the search occurred. It is agreed that from the date of his arrest until the search, Curtis was in jail. The state offers no evidence to explain how the $17,000 got to Bridges' house or how long it had been there. There is nothing in the record before this court which even vaguely connects the $17,000 with any felony drug abuse offense.
 {¶ 60} In U.S. v. U.S. Currency, $30,060 (9th Cir.), 39 F.3d 1039, a federal court reversed a trial court's grant of forfeiture. In part, the court found that the bundling of large sums of money into packets was insufficient to establish the money was specifically linked to drug activity. The court explained what the standard was as follows: "The government contends that drug dealers carry their money in wrapped bundles and that $30,060 is consistent with the cost of two kilograms of cocaine. It provides, however, no authority for these contentions, which are, in any case, speculative. It seems perfectly reasonable that anyone who is in possession of a large sum of money, for whatever purpose, might separate that money into smaller and more easily manageable increments. * * * [A] mere suspicion of illegal activity is not enough to establish probable cause that the money was connected to drugs. [Citation omitted.] [Defendant] "could just as easily have been a distributor of `street money' in a political campaign, an embezzler, a jewel smuggler, an art thief, or an S L crook as a drug conspirator." (Citation omitted.) As this court recently explained, "suspicions of general criminality are not enough. To obtain forfeiture under § 881, the government must have probable cause to believe that the money is connected specifically to drug activities." Id. at 1044.
 {¶ 61} There is also a significant discrepancy in the state's evidence concerning the amount of money found in Bridges' closet. Exhibit 17 shows $10,000 in cash, which amount is inconsistent with the $14,000 originally described by Officer Cook. Tr. 33-34. Obviously, if $10,000 was found in the closet and $3000 found in an upstairs bedroom, the total is only $13,000, not the $17,000 claimed in the forfeiture.
 {¶ 62} In the case at bar, .01 residue in the garbage, an excited narcotics-trained dog, and a few black rubber bands are not enough to show a nexus or probable cause between the $17,000 claimed in forfeiture and Curtis' drug abuse offense or, for that matter, any other felony drug abuse offense as required by R.C. 2925.43. Accordingly, I reject the majority's determination that the state's evidence met the clear and convincing test necessary for forfeiture. I would therefore, reverse the trial court's grant of forfeiture.
[2] The only conviction specified in this record is for the drugs found in the car on May 11.
[3] Most of the cases involve forfeiture of money.
[4] Many of the federal cases cited herein rely upon the forfeiture provision of the Comprehensive Drug Abuse Prevention Control Act of 1970, 21 U.S.C. § 881.
[5] In other words, we do not know whether anyone touched the money with their hands after it was removed from the closet or, for that matter, what else had been or was still in the drawer.
[6] The record does not even indicate the size of the paper.
[7] Exhibits 3, 4, and 5 are the actual bundles of cash found in claimant's bedroom closet. There is no evidence about how those bundles were wrapped, if at all, when they were found in the house.
[8] Tr. At 35.