761 F.Supp. 672 (1991)
UNITED STATES of America, Plaintiff,
v.
ONE HUNDRED THOUSAND DOLLARS ($100,000.00), Defendant.
No. 90-2085C(1).
United States District Court, E.D. Missouri, E.D.
April 11, 1991.
*673 Daniel E. Meuleman, Asst. U.S. Atty., St. Louis, Mo., for plaintiff.
Coggan Mills, Clayton, Mo., for defendant.

MEMORANDUM
NANGLE, District Judge.
The United States brings this forfeiture action under 21 U.S.C. § 881(a)(6) against $100,000.00. Claimant Tammy Thompson Jones seeks return of the money. The case was tried to the Court sitting without a jury. The Court having considered the pleadings, the testimony of the witnesses, and the exhibits, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law.

Findings of Fact
1. On May 8, 1990, Detective Donna Roussin, a St. Louis police officer assigned to the Drug Enforcement Administration's Drug Task Force at St. Louis' Lambert Airport, noticed claimant standing in line at the TWA ticket counter, looking around frequently as though to see if she was being observed.
2. Detective Roussin moved to a closer vantage point, and there saw and heard claimant ask for two one-way tickets to Houston, Texas, which claimant paid for in cash. Detective Roussin later determined from TWA personnel that the cost of the tickets was $208, that the tickets were issued in the names of S. Thompson and James Thompson, and that the flight was one scheduled for the following day, May 9, 1990.
3. After claimant purchased the tickets, Detective Roussin observed her leaving the airport in a dark-colored Toyota.
4. Because the cash purchase of one-way tickets to Houston, which is considered a source city for drugs, raised in her mind suspicion of drug trafficking involvement, Detective Roussin returned the next day with two other officers to observe claimant's departure on the flight to Houston.
5. Claimant arrived at the gate with a man later identified as her husband, Kenneth Jones. In the gate area, claimant and her husband sat and talked together, but occasionally looked about as though checking to see if they were being observed.
6. When boarding was announced, claimant and her husband separated and boarded the plane approximately 10 passengers apart from one another.
7. Detective Roussin took a position near the boarding agent, and observed that the tickets used by claimant and her husband were those claimant had purchased the day before.
8. Detective Roussin and Detective Hiram Blois boarded the plane and found claimant and her husband seated together in the last row at the rear of the plane. Drug traffickers often choose seats that enhance the probability that they will be either the first or last passengers to deplane.
9. Upon reaching claimant and her husband, the detectives showed their identification and asked the two to speak with them outside the plane. Claimant and her husband rose, retrieved their carry-on items, and followed the detectives off the plane to the jetway.
10. Detective Roussin asked to see claimant's ticket, which was issued in the name "S. Thompson." When Detective *674 Roussin asked claimant for some identification, claimant indicated she was not sure she had any with her, but knelt to the ground to set down her purse and look through it. Detective Roussin saw a Social Security card in the purse as claimant looked through it, and asked to see the card. The Social Security card was in the name of Tammy Jones.
11. Several times during claimant's search of her purse, claimant, who was wearing slacks with a loose-fitting tunic-style top over them, appeared to be using one hand to adjust something under her clothes in the region of her waist.
12. Detective Roussin asked claimant if she was traveling with a large sum of money, and claimant replied that she had approximately $20.00 with her.
13. Detective Roussin asked if claimant would submit to a pat-down search; claimant assented. In conducting the search, Detective Roussin felt a number of rectangular packages arrayed around claimant's waist under her clothing. When asked what the packages were, claimant indicated they were currency. In response to further questions, claimant said that the money was not hers, that she did not know to whom it belonged, and that it was a large sum.
14. Detective Roussin told claimant she was detaining the money, and asked claimant whether she would prefer giving up the money then and there and getting a receipt for it, so that she could re-board the plane for her flight, or returning with Detective Roussin to the DEA office to remove the money. Claimant indicated that the money was in her underwear, so that she wanted to go to the office before removing it.
15. Detective Roussin told Detective Blois, who was talking with claimant's husband, that she and claimant were going to the DEA office. Claimant's husband was told he was free to go, but he accompanied the others to the office.
16. One of the officers asked claimant whether she had checked any luggage, and thereafter her suitcase was retrieved by one of the officers and brought to the DEA office.
17. In an interview room within the DEA office, Detective Roussin saw claimant remove the defendant currency from underneath her girdle inside the waist of her slacks. The currency was packaged in ten stacks, each containing one hundred $100 bills and having a rubber band binding each end of the stack.
18. Detective Roussin told claimant that she did not have to answer any questions she did not want to answer; claimant testified at trial that she answered freely those questions that she did answer.
19. Claimant's husband entered the room, saw the currency on a table, and declared that he knew nothing about the money or where it came from. At this point, claimant appeared to be nervous in that she was perspiring and shaking.
20. Claimant was asked where the money came from, and she said she had won it playing bingo in several different states. In response to further questions, claimant said that the trip to Houston was for the purpose of visiting friends whose names she would not disclose.
21. At this point, claimant's suitcase, which had been checked, was brought in. The name tag on the suitcase was one of the paper tags TWA provides at its ticket counters; claimant admitted having filled it out in the name of Sandra Thompson to match the name on her ticket. The address given on the luggage tag was on a street named Helen.
22. With claimant's permission, the suitcase was searched. A large roll of duct tape was found in the luggage. Because duct tape is often used to reinforce plastic bags holding drugs or to "body wrap" money or drugs on a person, claimant was asked about the tape. Claimant said she did not know why the duct tape was in her bag.
23. Detective Roussin told claimant that the currency would be subjected to a sniff by a dog trained to alert to the odor of narcotics. Claimant indicated her desire to stay to witness the money being counted and the dog sniff.
*675 24. The dog sniff was performed by Officer Billy Stiegler, a canine handler, and her trained dog Carlo. The dog clearly alerted to the one of three new and identical cardboard boxes in which the defendant currency had been placed, and the three boxes were placed at different locations some distance from one another within the room in which the search was done.
25. A driver's license in claimant's purse that day showed claimant's name as Tammy Thompson Jones and her address as on a street named Pershing.

Conclusions of Law
Section 881(a)(6) of Title 21 of the United States Code provides in pertinent part:
(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:
(6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter[.]
In a civil forfeiture action pursuant to 21 U.S.C. § 881, the government bears the initial burden of showing that probable cause exists to believe that the property seized was involved in criminal wrongdoing. United States v. $22,287.00, 709 F.2d 442, 447 (6th Cir.1983). After the government has met its burden, the burden shifts to the claimant to show that the property was not used in violation of the law. Id. The Court will next address the question of whether the government has met its burden of establishing probable cause.[1]

Probable Cause
To establish probable cause the government must show "a reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion." United States v. One 1978 Chevrolet Impala, 614 F.2d 983, 984 (5th Cir.1980). Probable cause may be based wholly on circumstantial evidence, and the government is not required to trace cash to specific transactions or actually prove by a preponderance of the evidence a substantial connection to drug dealing. United States v. $41,305.00 in Currency, 802 F.2d 1339, 1343 (11th Cir.1986); United States v. $364,960.00 in U.S. Currency, 661 F.2d 319, 323 (5th Cir.1981). The government must, however, show by a preponderance of the evidence a "nexus `between the property to be forfeited and the criminal activity defined by the statute;' i.e., the exchange of a controlled substance." United States v. $22,287.00 United States Currency, 709 F.2d 442, 447 (6th Cir.1983), quoting $364,960.00 in United States Currency, 661 F.2d at 323.
Courts have found that a large amount of money, unexplained, found in combination with other persuasive circumstantial evidence may be sufficient to establish probable cause. United States v. $38,600.00 in United States Currency, 784 F.2d 694, 698 (5th Cir.1986). Large amounts of money combined with a claimant's admission of the money's intended purpose or evidence of past drug-related activities, significant supplies of drug paraphernalia or the discovery of actual drugs have been found sufficient to establish probable cause for forfeiture. Id.[2]
*676 Where, however, smaller sums of money are involved and smaller amounts of drugs or drug paraphernalia are found, courts have been less willing to find probable cause supporting forfeiture.[3]
In the Court's estimation, the facts to be considered in determining whether the government has met its burden in the instant case are the following:
(1) the purchase with cash of one-way tickets, under assumed names, to Houston, which is considered to be a source city for drugs into St. Louis;
(2) the behavior of claimant and her husband in the airport prior to boarding;
(3) claimant's concealment of the defendant money and the manner in which it was concealed;
(4) the large sum of currency;
(5) the roll of duct tape in claimant's luggage;
(6) claimant's unsatisfactory and sometimes contradictory explanations as to the source and ownership of the currency and the nature of her trip to Houston; and
(7) the positive dog sniff for the presence of narcotics odor on the currency.
This evidence is, to say the least, largely circumstantial, and the only fact possibly establishing a direct nexus between the money and drugs is the positive dog sniff.[4] Nonetheless, the Court concludes that these facts, established by the government's reliable evidence, are sufficient to give rise to more than mere suspicion, though less than prima facie proof, that the defendant currency was exchanged for or intended to be exchanged for drugs.
The nature of the probable cause determination dictates a fact-dependency that makes other case law useful only in a comparative fashion. This Court's probable cause determination is, however, bolstered by comparison with the Ninth Circuit's affirmation of a finding of probable cause in United States v. $215,300 U.S. Currency, 882 F.2d 417 (9th Cir.1989), in which the finding was based on the large sum of cash involved, a positive canine alert, the claimant's attempts to avoid detection by concealing and lying about the money, his nervousness, and his source city destination. The additional facts here concerning attempts to avoid detection and the duct tape make the government's case even stronger than in $215,300, and the Court, though aware that this case is a closer one than many, makes the finding based on the aggregate of facts and circumstances that *677 the government has met its burden of proof as to probable cause.

Claimant's Burden
Once the government satisfies its burden of showing probable cause in a forfeiture action, the burden then shifts to the claimant to absolve the property in question of culpability by showing by a preponderance of the evidence that the money was not furnished or intended to be furnished in exchange for a controlled substance. United States v. Fleming, 677 F.2d 602, 609 (7th Cir.1982). The claimant can meet his burden by showing an alternative source for the funds. United States v. $41,305.00 in Currency, 802 F.2d at 1345. Claimant must, however, "do more than show the existence of possible legitimate sources of cash." Id.
In the instant case, the government has raised a substantial issue concerning claimant's standing to contest the forfeiture, based on her proffered explanation of the source of the money. According to claimant's trial testimony, she came into possession of the money in the following manner, approximately a week before the Houston trip. Claimant testified that while exiting her car after arriving at her mother's house, she saw something being thrown from the window of a car passing nearby on an adjacent street. Claimant further testified that out of curiosity, she retrieved the object, which proved to be a brown paper bag, and found the defendant currency inside. The government argues, therefore, that based on her own testimony claimant had under Missouri law only the status of a mere possessor of the money, and does not have the ownership interest required to contest the forfeiture.
The Court believes, however, that a ruling on this thorny question is not necessary. Even assuming that claimant does have standing to contest the forfeiture, the Court finds that claimant has failed to meet her burden of proving that the money was not furnished or intended to be furnished in exchange for a controlled substance. At best, claimant has only shown the possibility of an innocent source for the seized money, and even the possibility she raised is ruled out by the Court's determination, announced from the bench at the conclusion of claimant's testimony, that claimant's tale was entirely lacking in credibility and the Court would disregard it.[5] The Court here makes explicit its finding that claimant has failed to meet her burden of proof with respect to the legitimacy of the defendant currency's source and purpose.

Conclusion
Accordingly, the Court denies claimant's motion to dismiss and enters judgment in favor of the government, ordering that the defendant currency be forfeited.
NOTES
[1] Although claimant has made no formal motion to suppress evidence, claimant's counsel several times referred at trial to Fourth Amendment issues. Because evidence seized in violation of the Fourth Amendment is inadmissible in a forfeiture proceeding, see One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), the Court deems it advisable to pause briefly to express its conclusion that none of the physical evidence presented at trial or claimant's statements testified to at trial would be suppressible as obtained in violation of the Fourth Amendment. The Court has examined the procedures employed by the police officers in this case and found no constitutional misstep with respect to their searches and seizures.
[2] See also U.S. v. $13,000 in United States Currency, 733 F.2d 581 (8th Cir.1984) ($13,000 cash in shoulder bag containing plastic bags, tape, and rubber bands combined with claimant's phone calls placed on day before and day of seizure to residence he had contacted prior to earlier cocaine-distribution arrest sufficient to establish probable cause); United States v. $5,644,540.00 in United States Currency, 799 F.2d 1357 (9th Cir.1986) (over $5.5 million in suitcase in car, cocaine in suitcase with money, claimant's connection with motel known as site for drug transactions, and travel pattern consistent with practice of drug dealers sufficient to establish probable cause); United States v. $2,500 in United States Currency, 689 F.2d 10 (2nd Cir.1982) ($2,500 without explanation, notepad of recorded drug transactions, and claimant's earlier sale of $16,000 worth of heroin to DEA agents sufficient to establish probable cause); United States v. $84,000 in United States Currency, 717 F.2d 1090 (7th Cir.1983) ($84,000 found under claimant's clothing at airport, baggage containing cocaine and marijuana, and statements signed by claimant indicating money was to be used to purchase marijuana sufficient to establish probable cause); United States v. $41,305.00 in Currency, 802 F.2d 1339 (11th Cir.1986) (over $41,000, testimony of claimant's prior drug sale activities, possession of cocaine, and testimony of planned drug deal sufficient to establish probable cause).
[3] See, e.g., United States v. $38,600.00 in United States Currency, 784 F.2d 694 (5th Cir.1986) ($38,600 discovered under backseat of automobile combined with pipe bearing marijuana residue, cigarette rolling papers, small pair of scissors, and small tin box may give rise to probable cause of some illegal activity, but insufficient to establish that money connected with drugs); United States v. One 1981 Cadillac Eldorado, 535 F.Supp. 65 (N.D.Ill.1982) ($1,626 found on person of claimant, combined with discovery of 52.9 grams of heroin in crack of front seat of car two days after seizure insufficient to support forfeiture of car); United States v. Wright, 610 F.2d 930 (D.C.Cir.1979) ($2,100 seized from claimants in "narcotics shooting gallery" in which heroin, narcotics paraphernalia and weapons also found insufficient to establish probable cause for forfeiture).
[4] The Court here rejects claimant's attack on the credibility of the canine alert. Trial testimony established to the Court's satisfaction both the dog's training and good record for detecting narcotics odor and the reliability of the sniff test in this instance, given the precautions and procedures employed.
[5] The Court notes that claimant admitted during her testimony that, even on her version of the facts, she wondered whether the money was drug-related.