77 F.3d 483
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael W. KING, Defendant-Appellant.
 No. 94-6535.
 United States Court of Appeals, Sixth Circuit.
 Feb. 15, 1996.
 
 Before: CONTIE, BATCHELDER, and MOORE, Circuit Judges.
 OPINION
 MOORE, Circuit Judge.
 
 
 1
 Michael W. King appeals his convictions for attempt and conspiracy to possess cocaine with intent to distribute, violations of 21 U.S.C. § 846. Specifically, King challenges: (1) the introduction into evidence of a staged photograph taken by the government, and (2) the propriety of various comments made by the government in closing argument. Finding no reversible error, we affirm.
 
 I. BACKGROUND
 
 2
 King was the addressee of a package containing a kilogram of cocaine. Drug enforcement officials intercepted the package after being alerted to it by the United Parcel Service in Fort Myers, Florida, and they substituted fake cocaine. They then supervised the delivery of the package to King at his home in Kentucky. Shortly after delivery, the officials entered King's house pursuant to a search warrant and found King on the telephone, sitting next to the unopened package with $2,000 in his right hand. According to the officials, King admitted to them that the package contained cocaine and that he had received it from someone named "Doug" in Fort Myers. The officials also found a ledger sheet in King's house showing large transactions that apparently totalled $20,000.
 
 
 3
 At trial, King denied that he had ever admitted knowing someone named Doug in Florida, and he denied knowing the contents of the package until the officials told him what was inside and opened the package themselves. King's son, Jeffrey, also testified, stating that the drug enforcement officials had "trashed" the kitchen and the rest of the house. On cross-examination, the government introduced a photograph to impeach Jeffrey. The photograph had been taken one hour into the search and showed the kitchen in seeming order. King objected that the photograph was unduly prejudicial because it was staged; the photograph showed King sitting near his son at the kitchen table with the package of fake cocaine, which had been opened by the arresting officers, right in front of him. King also questioned the photograph's probative value. Nonetheless, the district court admitted the photograph.
 
 
 4
 During closing argument, the government made several statements that King now finds objectionable. The prosecution: (1) called King a "drug dealer," (2) argued that King operated in a manner common to drug dealers, (3) referred to the ledger sheet found in his house as a drug record, (4) described the "clever" methods of the sender of the package, (5) suggested that King's financial troubles led him to deal drugs, and (6) invited the jury to consider the consequences if King were acquitted. Trial counsel did not enter a contemporaneous objection to any of these statements. Nevertheless, King argues on appeal that the government's closing argument, taken as a whole, was misleading and inflammatory enough to justify reversal.
 
 II. THE KITCHEN PHOTOGRAPH
 
 5
 King challenges the admission of the government's staged photograph on two grounds: first, he argues that it constituted improper use of extrinsic evidence to impeach a witness on a collateral matter; second, he argues that the photograph was substantially more prejudicial than probative, under Rule 403 of the Federal Rules of Evidence. Both contentions are unpersuasive.
 
 
 6
 Although it is generally true that extrinsic evidence may not be admitted in order to impeach a witness on a "collateral" issue, see United States v. Markarian, 967 F.2d 1098, 1102 (6th Cir.1992), cert. denied, 507 U.S. 942 (1993), it is apparent that the government used the photograph to impeach Jeffrey King on an issue that was more than collateral in this case. The conduct of the drug officials on the day they searched King's home formed a central part of Jeffrey King's direct testimony. Indeed, the vast majority of his testimony related to what the officials did--how they "stuck a gun in [his] face," interrogated him and his father without a lawyer, kept "running around wa[ ]ving guns and stuff," and completely "trashed" the house. The government sought to introduce the photograph to contradict this testimony, especially Jeffrey's statement that the drug officials "thr[ew] all the stuff out in the floor" in the kitchen. When presented on cross-examination with the photograph, which showed none of the disarray to which he had testified, Jeffrey explicitly retreated from his earlier descriptions of the officials' conduct. The district court had refused to admit the photograph during the initial stages of trial, but the court made clear during Jeffrey's testimony that it now considered the impeachment evidence to be significantly more probative.
 
 
 7
 There can be no doubt that the government used the staged photograph for a non-collateral purpose. Critical differences emerged at trial between the Kings' and the drug officials' accounts, and one of the defense's obvious strategies was to discredit the officials' behavior and their version of events as much as possible. Jeffrey King's testimony was a primary vehicle for this. Because the photograph was used to impeach the main subject of Jeffrey's testimony, concerning the conduct of the officials, King cannot now argue that it related only to a collateral matter. The district court's decision to admit impeachment evidence as non-collateral is reviewed for abuse of discretion, see Markarian, 967 F.2d at 1103, and King does not even come close to showing an abuse of discretion here.
 
 
 8
 King's argument that the photograph was substantially more prejudicial than probative must also fail. Rule 403 of the Federal Rules of Evidence provides:
 
 
 9
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 10
 This language has been interpreted as giving the district court "broad discretion" in deciding whether to admit potentially prejudicial material. United States v. Bonds, 12 F.3d 540, 567 (6th Cir.1993). As noted by the court in United States v. Zipkin, 729 F.2d 384, 389-90 (6th Cir.1984), "Appellate review of this discretion is limited. We must look at the evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." Even without this highly deferential standard of review, King would have a difficult time prevailing on appeal.
 
 
 11
 First, King does not make any serious showing of prejudice. He argues that the jurors were misled into connecting him with the cocaine or inferring that he was a drug dealer when they saw him sitting next to the open package in his kitchen. Yet, King fails to show how the photograph added anything that wasn't already presented in the evidence. King does not deny that the package originally addressed to him contained cocaine. He does not deny that he accepted the substituted package after delivery by UPS. He does not deny that he was sitting near the unopened package when the drug officials entered his house. In addition, the jury was informed that the officials had opened the package, not King. Thus, to the extent that the picture was staged, the jury already knew it was staged. It is hard to see how any prejudice could be found under such circumstances.
 
 
 12
 Second, as indicated earlier, the photograph was probative to the extent that it was used to impeach a material portion of Jeffrey King's testimony. The picture squarely contradicted Jeffrey's version of events, and Jeffrey even admitted as much. Although we certainly do not endorse a general practice by the government of using staged photographs taken by arresting officials, given the absence of any showing of prejudice, it is without question that the probative value of the photograph here outweighed any possible prejudicial effect. Certainly, there was no abuse of discretion.
 
 III. THE GOVERNMENT'S CLOSING ARGUMENT
 
 13
 King points to six pieces of the government's closing argument that he alleges were improper and that therefore require reversal. Four of these pieces are not even arguably problematic, however. For instance, King protests that the prosecution called him a "drug dealer," but this was clearly not improper because the whole point of the government's case was to prove King was a drug dealer, and the government presented evidence to back up its claim. See United States v. Castro, 908 F.2d 85, 90 (6th Cir.1990) (finding reference to defendants as "drug lords" proper "given the evidence in this case").
 
 
 14
 Similarly, King contends that the prosecution commented on facts outside the evidence on three occasions, when it: (1) argued that King operated in a manner common to drug dealers, (2) referred to the ledger sheet as a drug record, and (3) described the "clever" methods of the sender of the package. None of these statements, however, went beyond the realm of reasonable inference based on the evidence, which the prosecution was clearly entitled to argue to the jury. See United States v. Bess, 593 F.2d 749, 753 (6th Cir.1979). First, in order to explain the absence of drug paraphernalia such as scales and cutting agents in King's home, the government suggested to the jury that King could either have used a "safe house" to store his paraphernalia or have been a "middleman" in the drug distribution chain. In making this argument, the prosecutor referred to expert testimony that had been introduced to describe the methods commonly employed by drug dealers. Certainly, it was not improper to argue that the evidence on King was consistent with such methods. Second, in order to explain the ledger sheet found at King's home, the government again referred to expert testimony stating that such financial records, containing large, round sums totalling approximately $20,000, were consistent with drug records. The expert testimony also noted that a kilogram of cocaine would probably cost between $15,000 and $20,000 in the drug trade. Again, these statements at closing argument were based on the evidence and reasonable inferences therefrom. They cannot be characterized as improper.
 
 
 15
 In order to elucidate King's connection to the drug trade, the government commented on the "clever" methods of the sender of the package (which evidenced an individual familiar with drug trafficking techniques), and it emphasized the sender's relationship to King. King objects that the government merely speculated as to any information regarding the alleged sender, Doug Valdes, and his connection to King, but this is simply not so. Phone records revealed numerous calls between King in Louisville and Valdes in Fort Myers during the period preceding the package delivery. A mutual acquaintance testified that both King and Valdes knew each other. An arresting officer testified that King admitted to receiving the package from someone named "Doug" in Fort Myers. There was a clear link between Valdes and King, and it was not improper for the government to argue that Valdes's parcel was the handiwork of someone intimately familiar with the drug trade--the cocaine had been wrapped in mustard-coated dryer sheets to escape detection by drug-sniffing dogs, and it had been sent under a real (but innocent) person's name with a real address, in order to trick potential interceptors of the package. Nowhere in this argument did the government depart from the evidence before the court.
 
 
 16
 The fifth portion of the government's closing to which King objects concerns the suggestion that King's recent financial difficulties caused him to turn to drug dealing. King cites United States v. Zipkin, 729 F.2d 384, 389-91 (6th Cir.1984), for the proposition that evidence of a defendant's impecuniosity should only rarely be admitted to prove motive. We should note, however, that we are not presented with the question of whether such evidence should have been admitted. King himself introduced the testimony that he had lost his job shortly before the drug delivery incident. The government merely commented on the defense's own proof. Even if the evidence might not otherwise have been admissible, King raised the issue himself and cannot now complain of its effect on the jury. Again, it is axiomatic that the government was entitled to invite the jury to draw reasonable inferences from the evidence at hand. There was no impropriety here.
 
 
 17
 King's final challenge is addressed to the government's rebuttal closing argument, where it asked the jury to consider what would happen if they "let this drug dealer go free and he continues to deal dope in the City of Louisville[ ]" The government asserts that this comment was merely a response to the defense's blatant appeal to the jury to nullify the law. In other words, because the defense essentially invited the jury to let a drug dealer go free, the prosecution replied in kind, asking the jury to think of the consequences of doing so. King's argument was as follows:
 
 
 18
 You have got [a] rifle up [to] the guys in your [sights], you are fixing to pull the trigger[;] you have the power of life and death over that person you are aiming at, and you decide, even though you are in war, even though that person is your enemy, you make a conscious decision I am not going to pull the trigger, and you let him live. You have got the power of life and death at that moment. Mike King is in your [sights]. The sling is around your arm and it's tight. You are looking at him. You have the power to say I am not going to pull the [trigger]. You will never be as a group any[ ]more powerful than you are today.
 
 
 19
 (Tr. at 4-67). The government then responded:
 
 
 20
 In his final remarks to you [defense counsel] talked about the [sights] of a gun and how if you had, and this is not a life or death situation, ladies and gentlemen, let me make that clear to you all. But he mentioned the [sights] of a gun and if you had the enemy in [the sights] of your gun and you elected not to shoot, and you could do that. Just think about this, ladies and gentlemen, what if you elected not to shoot and that enemy later shot you or shot the person that is in the fox hole with you. Ladies and gentlemen, what would happen if you let this drug dealer go free and he continues to deal dope in the City of Louisville?
 
 
 21
 (Tr. at 4-70).
 
 
 22
 We express no opinion as to the "propriety" of the government's rebuttal. Assuming arguendo that the comments were improper, they were still not reversible error. King failed to object at trial to any of the government's closing argument, and so he can only obtain a reversal upon a showing of plain error. See United States v. Carroll, 26 F.3d 1380, 1383 (6th Cir.1994). In addition, King cannot argue that the comments were flagrant, as that term has been defined in this circuit, because they were isolated and given only in direct response to the defense's own closing argument. See id. at 1385-86 (setting forth three factors for evaluating flagrancy: "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; [and] (3) whether they were deliberately or accidentally placed before the jury"). As a result, King has no claim. This court has explicitly stated that "[i]n the absence of an objection, only flagrant conduct will warrant a 'plain error' reversal." United States v. Brown, 66 F.3d 124, 127 (6th Cir.1995), petition for cert. filed (Dec. 26, 1995) (No. 95-7268). The district court's decision to admit the prosecutor's comments must be upheld.
 
 
 23
 The judgment of the district court is AFFIRMED.