# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-2393

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of Nebraska. |
| | * | |
| $141,770.00 In United States | * | |
| Currency, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| ---------------------------- | * | |
| | * | |
| Rafael Moreno-Pena, | * | |
| | * | |
| Claimant - Appellant. | * | |
| | * | |

_____

Submitted: February 13, 1998
Filed: October 5, 1998

_____

Before LOKEN and HANSEN, Circuit Judges, and DAVIS,[1] District Judge.

_____

HANSEN, Circuit Judge.

---

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota, sitting by designation.

Rafael Moreno-Pena appeals from the district court's[2] probable cause determination in this 21 U.S.C. § 881 (1994) civil forfeiture action. He also contests the exclusion of certain evidence and the overruling of his objections to a series of questions asked by the government on cross-examination. We affirm.

I.

On July 26, 1995, George E. Scott, a Nebraska State Patrol officer, observed a Toyota camper drive onto the shoulder of Interstate 80 while traveling west through Hall County, Nebraska. After stopping the vehicle, Scott asked the driver for his license and vehicle registration. The driver's license revealed the driver to be Rafael Moreno-Pena (Moreno). Moreno's passenger, Jose Javier Herrera, identified himself as the owner of the vehicle. While Scott was talking to the occupants, he detected a "heavy odor of fabric softener sheets emitting from the interior of the vehicle." (Tr. at 123.) Scott testified that, based on his training, he knew that fabric softener sheets were often used to mask the odor of drugs or narcotics. Scott was told by Moreno and Herrera that the two had traveled from California, a state of drug origin, to Illinois and Wisconsin, drug destination states, and were on their way back to California. Scott testified that both men seemed extremely nervous during the encounter.

Trooper Scott returned to his patrol vehicle and prepared a written warning for the driver, Moreno. After delivering the written warning to Moreno, Scott asked Herrera to exit the camper, and Herrera complied. Scott then asked Herrera if the camper contained drugs, weapons, or large sums of cash, and Herrera answered in the negative. Scott then asked for and received Herrera's verbal permission to search the camper. Before searching the camper, Scott produced and read Herrera a consent-to-

---

[2]The Honorable William G. Cambridge, Chief Judge, United States District Court for the District of Nebraska.

search form, which Herrera willingly signed. Scott then asked Moreno to exit the camper, and Moreno complied.

About this time, Trooper Steve Kolb arrived to provide backup. Upon his arrival, Scott began to search the camper. He testified that, upon entering the camper, he was struck by "a very heavy odor of fabric softener sheets emitting from the entire interior of the vehicle." (Tr. at 126). Scott did not immediately locate any fabric softener sheets, but he did find several tools, including a hammer and four screwdrivers. At this point, Kolb began assisting in the search. The troopers soon located screws in the ceiling which bore marks indicating frequent removal. The ceiling panel also appeared as if it had been frequently removed and replaced. The troopers removed the worn screws and ceiling panel. Above the panel, the officers discovered a trap door, which they opened. Inside the trap door the officer found a hollow ceiling area containing five zip-lock bags. Each of the five zip-lock bags contained a second zip-lock bag, which in turn contained a third zip-lock bag. Inside each of the innermost zip-lock bags, the officers found large amounts of United States currency wrapped in scented fabric softener sheets. The total amount of cash in these five bags was $141,770.00.

When Scott discovered the bags, he motioned Moreno and Herrera into the camper and asked them who owned the large sums of cash. Both men denied any knowledge or ownership of the cash. (See Tr. at 130, 326.) These denials were called into question by receipts found in Moreno's pockets, which showed that he had purchased fabric softener and zip-lock bags in Bloomington, Minnesota, less than a week earlier. (Id. at 268-272.)

After Herrera and Moreno were taken to the police station, Nebraska State Trooper Jerry Schenck and his narcotics dog, Nero, performed a search on one of the five seized zip-lock bags of currency. The search was conducted as follows: First, Nero was told to search the empty room and did not alert. Next, money collected from

various troopers was placed in the room, and Nero was again directed to search the room. Again, Nero did not alert. Finally, one of the five zip-lock bags of money from the camper was placed in the room, and Nero was again told to search the room. Nero alerted to the money from the camper.

Schenck and Nero also performed a search on the camper. Nero alerted to the driver's side door and the side entrance of the camper. Additionally, Nero alerted to a black plastic bag that had been taken out of the false ceiling and was lying on the floor of the camper.

The United States filed a forfeiture action, alleging that the money found in the camper was either proceeds traceable to the exchange of a controlled substance or was intended to be used to facilitate the possession and distribution of a controlled substance. Moreno filed an answer, claiming that the money belonged to him and was derived from a legitimate auto body/used car business. After trial, the jury returned a verdict in favor of the United States. In addition to entering judgment based on this verdict, the court issued findings of fact and conclusions of law concerning its probable cause determination. Moreno appeals.

## II.

Moreno claims three points of error. First, he claims that the government failed to carry its burden of establishing probable cause to support the judgment of forfeiture. Second, he claims that the exclusion of proffered scientific evidence regarding the contamination of currency constituted error. Third, he claims that his Fifth Amendment right against self-incrimination was violated. We address each of these arguments in turn.

## A.     Probable Cause

Pursuant to 21 U.S.C. § 881(a)(6), all money furnished or intended to be furnished in exchange for illegal drugs, all drug proceeds, and all money used or intended to be used to facilitate illegal drug trafficking is subject to civil forfeiture.  In a forfeiture action under section 881, the United States bears the initial burden of establishing probable cause to connect property to drug trafficking.  See United States v. $39,873.00, 80 F.3d 317, 318 (8th Cir. 1996).  Establishing a connection to general criminality is not enough.  United States v. $191,910.00 in United States Currency, 16 F.3d 1051, 1071-72 (9th Cir. 1994).  The government meets this burden by presenting evidence which creates "more than a mere suspicion but less than prima facie proof" that the seized property is related to drug trafficking.  $39,873.00, 80 F.3d at 318 (internal quotations omitted).  In making a probable cause determination, the district court must look to "the 'aggregate' of all facts," considering both direct and circumstantial evidence.  United States v. United States Currency in the Amount of $150,660.00, 980 F.2d 1200, 1206 (8th Cir. 1992).  We review the district court's underlying findings of fact only for clear error, but we review determinations of probable cause de novo.  Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996); $39,873.00, 80 F.3d at 318.

Moreno argues that even a large amount of unexplained currency, standing alone, would be inadequate to support a forfeiture.  See $191,910.00 in United States Currency, 16 F.3d at 1072 ("any amount of money, standing alone, would probably be insufficient to establish probable cause for forfeiture"); but see $39,873, 80 F.3d at 319 ("[W]e have recognized that possession of a large amount of cash . . . is strong evidence that the cash is connected with the drug trade.").  We need not address this contention, because we are not faced with "a large amount of money, standing alone," but with a considerable amount of other circumstantial evidence.  First, the government presented evidence that Nero alerted to the seized money, to the door of the camper, and to a garbage bag which had fallen from the camper's hidden ceiling compartment.

Second, the government presented evidence that the camper had originated in California, a drug source state, and was on its way back to California with a very large amount of cash after having spent time in the upper Midwest,[3] a drug destination area. Most important, however, is the telltale packaging in which the seized currency was found. Had the money simply been concealed above the ceiling, Moreno could reasonably argue that its connection to drug trafficking was not immediately apparent. But where, as here, large sums of currency are not only stowed above the ceiling panel, but also wrapped in scented fabric softener sheets and sealed in three layers of zip-lock bags, the connection to drug trafficking cannot reasonably be disputed. The only conceivable reason for packaging money in this manner is to conceal the scent of illegal narcotics.[4]

---

[3]Moreno and Herrera originally told Trooper Scott that they had been in Wisconsin and Illinois. The evidence adduced at trial, however, confirmed only that the two had been in Minnesota.

[4]The wide-spread use of scented dryer sheets to mask the smell of illegal narcotics is well documented in the decisions of the Courts of Appeals. See, e.g., United States v. Stephens, No. 96-6551, 1997 WL 720412, at *3 (6th Cir. Nov. 14, 1997) (unpublished) ("Dryer fabric softener sheets are sometimes used to mask the odor of drugs."); United States v. Miller, No. 96-5788/5853, 1997 WL 400098, at *1 (6th Cir. Jul. 11, 1997) (unpublished) (dryer sheets commonly used by drug couriers to mask the smell of illicit drugs); United States v. Davis, No. 95-5776, 1997 WL 100919, at *2 (4th Cir. Mar. 6, 1997) (unpublished) (common practice in drug trade to line a secret compartment with dryer sheets to confuse narcotics-sniffing dogs); United States v. Mendez, 102 F.3d 126, 127 (5th Cir. 1996) (cocaine found packaged in fabric softener and coffee grounds); United States v. Lee, No. 95-5782, 1996 WL 383917, at *1 (4th Cir. Jul. 10, 1996) (unpublished) (drugs found packaged in consecutive layers of dryer sheets and zip-lock bags), cert. denied, 117 S. Ct. 493 (1996); United States v. $39,873.00, 80 F.3d 317, 319 (8th Cir. 1996) (drug traffickers use dryer sheets to mask the scent of narcotics); United States v. King, No. 94-6535, 1996 WL 67937, at *4 (6th Cir. Feb. 15, 1996) (unpublished) (drug-trafficker wrapped drugs in mustard-coated dryer sheets to escape detection by drug-sniffing dogs); United States v. Grover, No. 94-5903, 1996 WL 226262, at *4 n.3 (4th Cir. May 6, 1996) (unpublished) (drug money wrapped in plastic and packaged with pillows and fabric softener), cert. denied, 117 S. Ct. 235 (1996); United States v. Williams, No. 94-5556, 1995 WL 597544, at

Finally, various comments made by Moreno are incompatible with the evidence. Although Moreno claims that he brought the money from California, receipts found in his pockets verify that he purchased the dryer sheets and zip-lock bags in Minnesota. Moreno does not explain why he waited to wrap the money in this fashion until he reached Minnesota. Additionally, Moreno's statement that this money constituted legitimate business proceeds is undercut both by his inability to produce any tax records regarding the source of this income and by his initial denial of ownership over the money.

In light of the aggregate facts of this case, we independently conclude that the government met its burden of showing probable cause that the seized currency was connected to drug trafficking, i.e., more than mere suspicion but less than prima facie proof.

## B.    The Exclusion of Scientific Evidence

At trial, Moreno sought to discredit the significance of Nero's positive alerts by introducing scientific evidence that a significant percentage of United States currency

---

*2 (4th Cir. Oct. 11, 1995) (unpublished) (cocaine found wrapped in dryer sheets), cert. denied, 516 U.S. 1153 (1996); United States v. Jones, No. 93-6107/6108, 1994 WL 629396, at *1 (6th Cir. Nov. 8, 1994) (unpublished) (cocaine wrapped in dryer sheets inside sealed package), cert. denied, 514 U.S. 1028 (1995); United States v. Brown, No. 92-5873, 1993 WL 290072, at *2 (6th Cir. Jul. 30, 1993) (unpublished) (cocaine hydrochloride found packaged with dryer sheets). Although Moreno denied ownership of the money when it was discovered in the camper's ceiling, he later admitted that he had wrapped the money in the dryer sheets and zip-lock bags and hidden it above the ceiling. He said that he had seen television reports in which similar tactics were employed to prevent detection by dogs, and that he had done so to protect his money from the police. (Tr. at 320-21.)

is contaminated with drug residue. In particular, Moreno sought to introduce the testimony of William Ihm, a forensic chemist, who believes that 99 percent of United States currency is contaminated with some amount of drug residue. After an evidentiary hearing prior to trial, the district court granted the government's motion to exclude Mr. Ihm's testimony. Moreno claims that Mr. Ihm's testimony was crucial to the determination of probable cause, and that the exclusion of such evidence constituted reversible error. We review for abuse of discretion. General Elec. Co. v. Joiner, 118 S. Ct. 512, 517, 519 (1997); Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 296 (8th Cir. 1996) ("Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court, and these decisions will not be disturbed on appeal absent an abuse of that discretion."), cert. denied, 117 S. Ct. 1552 (1997).

Under Federal Rule of Evidence 702, expert testimony is admissible only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" Where expert testimony concerns scientific evidence, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993). In other words, proffered scientific evidence must be both reliable and relevant. Id. at 595. As discussed below, Ihm's methodology fails both prongs of the Daubert test.

1.    Ihm's Proffered Testimony is Unreliable

Ihm's methodology is incapable of producing the conclusion to which he was prepared to testify—that 99 percent of all United States currency is contaminated with drug residue. With the exception of five bills supplied to him by a local television station, his "methodology" consisted of taking whatever bills were brought to him by the narcotics unit of the Omaha Police Department or the Bellevue Police Department and testing them for drug residue. (See Tr. at 47-49.) Because bills seized during

narcotics investigations are not necessarily representative of the general population of bills in circulation, Ihm's methodology cannot support the conclusion that 99 percent of bills in circulation are contaminated with drug residue. At best, his results show that most bills seized in narcotics investigations are corrupted with drug residue.

Second, Mr. Ihm's methodology—to the extent that he can be said to have had one—does not bear any of the indicia of reliability articulated in <u>Daubert</u>. <u>See</u> <u>Daubert</u>, 509 U.S. at 593-94. Mr. Ihm has not submitted to peer review any of the test results which form the basis of his opinion. His rate of error is unknowable but potentially very high, especially in light of the fact that he handled many bills without changing his gloves. (Tr. at 27, 41.) Nor can Ihm's tests be replicated, since he placed no controls over his samples. In short, the district court correctly concluded that Ihm's testimony was not sufficiently reliable to be of assistance to the trier of fact.

## 2.    Ihm's Proffered Testimony is Irrelevant

Ihm's proffered testimony also flunks the relevancy prong of <u>Daubert</u>, because even if believed, it would not make the existence of any material fact more or less probable. <u>See</u> Fed. R. Evid. 401; <u>Daubert</u>, 509 U.S. at 594-95. The relevant facts are as follows: Nero was presented with a stack of currency collected from various Nebraska state troopers, and he did not alert; Nero was then presented with the seized currency, and this time he did alert. From these facts arises a reasonable inference that the seized money contained a significantly higher concentration of drug residue than did the money collected from the Nebraska patrolmen and used as a control. To be relevant, Ihm's testimony would have to impeach this inference.

Ihm's proffered testimony is incapable of impeaching this inference. Ihm was prepared to testify only that 99 percent of all United States currency is contaminated with traces of illegal drugs detectable by gas chromatograph mass spectrometers. However, the authorities did not utilize such a device in this case. Rather, the

authorities relied on a drug-sniffing dog, and this dog reacted to only one of two piles of currency. Because Ihm was not prepared to testify as to the level of contamination which must exist before a drug-sniffing dog will alert to currency, or as to the percentage of United States currency which contains this requisite level of contamination, the trial court was justified in concluding that his testimony would tend to confuse rather than to aid the trier of fact. See General Elec. Co., 118 S. Ct. at 519 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

## C.      Moreno's Privilege Against Self-incrimination

During his case-in-chief, Moreno tried to establish that the seized currency was not derived from drug trafficking but rather from a legitimate private business. To this end, Moreno testified that he had earned the seized currency from his private business activities during the period between 1990 and 1994. Moreno testified that he owned a business in San Diego known as "Moreno Auto Body" and that he also sold used cars at auctions in Mexico.

In an attempt to impeach Moreno's testimony that the money was derived from legitimate business activities, the government attorney asked Moreno on cross-examination if he had paid any federal income tax on any of the alleged business profits in 1990, 1991, 1992, 1993, or 1994. Moreno objected to the questions, but his objections were overruled. Rather than answer the question, Moreno invoked the Fifth Amendment privilege against self-incrimination. Moreno claims that overruling his objection to the questions constituted error, because it allowed the government to elicit an invocation of the Fifth Amendment in front of the jury.

We have held that a mistrial may be warranted when the prosecutor calls a witness to the stand in a criminal trial and intentionally elicits an invocation of the Fifth Amendment. See United States v. Reeves, 83 F.3d 203, 207 (8th Cir. 1996); United

States v. Quinn, 543 F.2d 640, 649-50 (8th Cir. 1976). However, this case is distinguishable from Reeves and Quinn on several grounds. First, this is not a criminal action. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) (Fifth Amendment does not forbid adverse inference when privilege is claimed by a party to a civil action).[5] Second, it was not the government, but Moreno himself, who called Moreno to the stand. See United States v. Ornelas-Rodriguez, 12 F.3d 1339, 1348 (5th Cir.) (finding no error in district court's refusal to grant mistrial where Fifth Amendment invocation was elicited during government's cross-examination of a nongovernment witness), cert. denied, 512 U.S. 1222 (1994). Third, there is little likelihood that the jury drew any unwarranted inferences against Moreno. See Quinn, 543 F.2d at 650 (mistrial only required in criminal trial where jury is likely to draw *unwarranted* inferences against criminal defendant from government witness's invocation of the Fifth Amendment). The obvious purpose of the government's questions was to impeach the credibility of Moreno's account of where he obtained the money, not to cause the jury to believe that Moreno was a tax evader. Moreno had clearly opened the door to this inquiry when he claimed that the proceeds came from his auto business. We therefore find no abuse of discretion in the district court's decision to overrule Moreno's objections.

---

[5]The Fifth Amendment's Self-Incrimination Clause "has been applied in civil forfeiture proceedings, but only where the forfeiture statute had made the culpability of the owner relevant or where the owner faced the possibility of subsequent criminal proceedings." See Austin v. United States, 509 U.S. 602, 608 (1993). In rem forfeitures under 21 U.S.C. § 881 are not predicated on the culpability of any defendant, and there is no evidence that Moreno faces any criminal proceedings related to this incident. Accordingly, this is a civil action for purposes of the Fifth Amendment's Self-Incrimination Clause. See United States v. Two Parcels of Real Property located in Russell County, Alabama, 92 F.3d 1123, 1129 (11th Cir. 1996) (in rem forfeitures under 21 U.S.C. § 881 are civil for purposes of Self-Incrimination Clause); Cf. United States v. Ursery 116 S. Ct. 2135, 2149 (1996) (in rem civil forfeitures under 21 U.S.C. § 881 are neither "punishment" nor "criminal" for purposes of the Double Jeopardy Clause).

III.

Accordingly, we affirm the judgment of the district court.

MICHAEL J. DAVIS, District Judge, dissenting and concurring.

While I concur with Parts B and C of the majority opinion, I must dissent from Part A, in which the majority finds that probable cause existed to establish that the currency at issue was connected to drug trafficking. In my view, the totality of the evidence does not support a finding of probable cause as the circumstantial evidence is extremely weak.

Forfeitures are disfavored and should be enforced only when within both the letter of the law and the spirit of the law. Muhammed v. Drug Enforcement Agency, 92 F.3d 648, 654 (8th Cir. 1996); United States v. One 1976 Ford F-150 Pick-Up, 769 F.2d 525 (8th Cir. 1985)(citing United States v. One Ford Coach, 307 U.S. 219, 226, 59 S.Ct. 861, 865, 83 L.Ed. 1249 (1939)). The letter of the law is clear: In order to seize property, the government must show probable cause to connect property to drug trafficking. See 19 U.S.C. § 1615; United States v. $39,873.00, 80 F.3d 317, 318 (8th Cir. 1996); United States v. $91,960.00, 897 F.2d 1457, 1462 (8th Cir. 1990). Probable cause exists only where the government's evidence creates "more than a mere suspicion but less than prima facie proof" that the money is connected with drug trafficking. United States v. $39,873.00, 80 F.3d at 318. In other words, the government must show a nexus between property to be forfeited and criminal drug trafficking activity. United States v. $100,000.00, 761 F. Supp. 672 (E.D. Mo. 1991). The spirit of the law also is clear: Forfeiture statutes are meant to divest the blameworthy, not the inept, of private property. Muhammed at 654, citing United States v. Premises Known as 3639- 2nd St., N.E., 869 F.2d 1093, 1098 (8th Cir. 1989) (R. Arnold, J. concurring). As a result, in order to satisfy the intent of 21 U.S.C. § 881(a)(6), the "*quality* of the relationship between the property and the crime must be

substantial." Premises Known as 3639- 2nd St., N.E., 869 F.2d at 1098 (R. Arnold, J. concurring).

When viewing all facts in the aggregate, I believe the forfeiture in this case does not fall within either the letter or spirit of the law. Appellant Moreno and one of his employees, Mr. Herrara, were traveling through Nebraska in a camper on their way to Los Angeles from Minnesota. Mr. Moreno owns and operates Moreno Auto Body, through which he buys and sells used automobiles. At trial, he testified that he was in Minnesota for the purpose of identifying vehicles to purchase for his business. Mr. Moreno had flown to Minnesota, but decided to drive back to California with Mr. Herrera. While driving through Nebraska, a State Trooper observed their camper drive onto the shoulder. For this slight infraction, the trooper ordered to the camper to pull over. When speaking with the driver, the trooper testified that he smelled the scent of dryer sheets emitting from the camper. The camper was eventually searched, and money, packaged in dryer sheets and zip lock bags, was found. No drugs, drug paraphernalia or weapons were found in the camper or on Mr. Moreno's or Mr. Herrara's person.

Mr. Moreno has no prior drug convictions. There is no evidence that he uses or distributes drugs. To the contrary, evidence was submitted at trial establishing that he runs an auto shop, and deals mainly in cash. Documents were admitted at trial corroborating his testimony regarding his business, including invoices, and DMV records. In addition, Mr. Moreno's proffered purpose for being in Minnesota was corroborated by the Government's investigation. For example, the Government determined that while in Minneapolis, Mr. Moreno and Mr. Herrara placed several phone calls to auto body shops in the San Diego Area. (Tr. 273-279).

Seemingly ignoring the fact that Mr. Moreno has no drug convictions, that no drugs, drug paraphernalia or weapons were found, and that Mr. Moreno provided an

-13-

explanation for the large amount of money found in the camper, the majority finds that sufficient circumstantial evidence exists to support probable cause the money is connected to drug trafficking. First, the majority states probable cause is supported by the fact that the camper originated from California, a drug source state. The record is devoid of any evidence, however, that defines a "drug source state" and how California fits such definition. Does the fact that California borders a foreign country make it a "drug source state"? If that is the case, then twenty-eight of the fifty states in this country should be defined as a "drug source state."[6] Similarly, does any city in which an international airport is located become a "drug source city"?

The majority states that the most telling evidence supporting probable cause was the way the money was packaged. While I certainly recognize that wrapping money in dryer sheets in zip lock bags has been found to mask the smell of illegal narcotics, I do not agree that such packaging, <u>without</u> corroborating drug evidence, is sufficient to establish probable cause the money is connected to drug trafficking. For instance, in <u>United States v. $39,873.00</u>, evidence of dryer sheets supported a finding of probable cause, <u>together</u> with evidence of drug paraphernalia and drugs. 80 F.3d at 318. In this case, there is absolutely no evidence connecting Mr. Moreno to drugs, drug paraphernalia or of a history in dealing in drugs.[7]

The majority also bases its finding of probable cause on the dog[8] alert to the packages of money, and the camper doors. However, as this circuit has previously

---

[6]Twenty-eight states either border Mexico, Canada or a body of water such as the Atlantic or Pacific ocean.

[7]It is also important to note that the camper involved in this case did not have a hidden compartment of the type used to conceal and transport narcotics.

[8]Is it a coincidence that the dog in this case is named Nero? History remembers the Roman Emperor Nero as an evil man who sent the then detested Christians to horrible deaths and sat idly composing music while fire destroyed Rome.

found, "it is well-established that an extremely high percentage of all cash in circulation in America today is contaminated with drug-residue. Muhammed, 92 F.3d at 653 (citation omitted). Thus, contamination alone is virtually meaningless as it is unknown where or when the money was contaminated. Id. [9]

The facts presented in this case are analogous to those addressed in Muhammed, 92 F.3d 648, United States v. $7,850.00 in U.S. Currency, 7 F.3d 1355 (8th Cir. 1993) and United States v. $506,231.00 in U.S. Currency, 125 F.3d 442 (7th Cir. 1997).

In Muhammed, the Muhammed family from near Los Angeles had been visiting family in Missouri, and had purchased one-way tickets back to Los Angeles by paying in cash. Mr. and Mrs. Muhammed were approached by DEA agents at the airport, and were separated and interviewed, without Miranda warnings. Muhammed, 92 F.3d at 650. Mr. Muhammed was carrying $70,990 in his bags, and explained that the cash was a result of fundraising activities for the Nation of Islam. A drug dog alerted to the cash, and it was seized. Id. Similarly, Mrs. Muhammed was carrying $22,000 in her

---

[9]In his dissenting opinion in Bennis v. Michigan, 516 U.S. 442, 460 n.1 (1996), in which he was joined by Justices Souter and Breyer, Justice Stevens noted:

> Without some form of an exception for innocent owners, the potential breadth of forfeiture actions for illegal proceeds would be breathtaking indeed. It has been estimated that nearly every United States bill in circulation — some $230 billion worth — carries trace amounts of cocaine, so great is the drug trade's appetite for cash. See Range & Witkin, The Drug-Money Hunt, U.S. News & World Report, Aug. 21, 1989, p. 22; Heilbroner, The Law Goes on a Treasure Hunt, N.Y. Times, Dec. 11, 1994, p. 70, col. 1. Needless to say, a rule of strict liability would have catastrophic effects for the nation's economy.

See also, United States v. $53,082.00 In U.S. Currency, 773 F.Supp. 26 (E.D. Mich. 1991) aff'd 985 F.2d 245 (6th Cir. 1993)(factors relied on by the government to show probable cause were equally consistent with others kinds of illegal activity not involving drugs; dog alert proved nothing.)

girdle, but said she was uncertain where her husband had obtained the cash. When a drug dog alerted to that cash, it was also seized. Id. About five months after the seizure, Mr. Muhammed was stopped in the St. Louis airport after he allegedly "discarded" a ticket not in his name and was found to have 12.7 grams of marijuana on his person. Id. at 653. Even though a small amount of drugs had been found, a panel from this circuit characterized this case as "a seemingly baseless government seizure of its citizens' cash currency." Id. at 653.

While the government's failure to perfect the seizure in Muhammed turned on the lack of adequate notice to the claimants, the case nonetheless illustrates that no undue deference should be afforded to drug-alerts by dogs to large amounts of cash, in the absence of some evidence linking the alerts to an actual drug transaction. A mere alert to cash simply threatens to inculpate law-abiding citizens.

In United States v. $7,850 in U.S. Currency, 7 F.3d 1355 (8th Cir. 1993), the claimant had purchased a one-way air ticket in the Minneapolis-St. Paul airport to Omaha, with cash. He was not carrying any baggage or identification and had the same physical description of an individual found in the Narcotics and Dangerous Drugs Information System (NADDIS), which also reported that the claimant had a heroin supplier in Omaha. The claimant had been seen at the airport the previous day, and had lied about that fact. In addition, a police dog made a positive drug-alert and "bit at the money, indicating the currency had recently been in contact with controlled substances." Id. at 1357.[10] The district court had granted summary judgment in favor of the government, but this court reversed, finding that no probable cause, prior to seizure, could establish a connection to contraband. Id., at 1358.

---

[10]Because the initial seizure which was effected in order to conduct the drug-sniffing test was made without a warrant or consent, the Court of Appeals held that the seizure was illegal. The positive drug-alert was referenced in the facts, but not the holding.

Finally, in <u>United States v. $506,231.00</u>, currency was seized from a Chicago pizzeria alleged to be a buyer of stolen property. A police search, pursuant to a warrant, discovered three unregistered guns and the more than $500,000 defendant currency, stashed inside a 44-gallon barrel, and wrapped in plastic bags. 125 F.3d at 452. In addition to the weapons and an unusual storage of such a large amount of currency, the government asserted that a positive drug alert by a police dog and a witness who had seen a cocaine delivery to the pizzeria helped establish probable cause. <u>Id.</u> The Seventh Circuit Court of Appeals held that this evidence, taken together, did not establish a connection to drug trafficking. <u>Id.</u> at 452-453.

In the case at bar, the government has failed to establish probable cause that the currency was connected to drug trafficking. There is no evidence that ties the currency to drug trafficking, such as drugs or drug paraphernalia in the camper or on the individuals and the lack of evidence regarding any associations to drug dealers. It seems the government has raised only a "mere suspicion" that the cash was related to drug trafficking, but that suspicion is no greater than the suspicion that the cash is related to some other transaction, even an illegal one, not subject to the forfeiture provisions of 21 U.S.C. § 881.

While I do not find the district court's decision to allow the government to explore the claimant's taxpaying history to be a clear error under the abuse of discretion standard, the issue to which his tax history speaks is not necessarily suggestive of drug trafficking. To satisfy the forfeiture requirements of 21 U.S.C. § 881 and the logical relevance standards prescribed by Fed. R. Evid. 403, the government must show a nexus between the evidence of failure to properly pay taxes and drug trafficking. There can be no question that the failure to properly pay taxes is evidence of some variety of wrongdoing. However, that fact is no more probative of *drug trafficking* than it is of failure to report income from his otherwise legitimate business, trading guns or even running an illegal auto parts business between the United States and Mexico. The forfeiture statute makes no provision for wrongfully obtained

funds *not* related to drug trafficking. See  United States v. $150,660.00, 980 F.2d 1208 (8th Cir. 1992).  See also, United States v. $38,600 in U.S. Currency, 784 F.2d 694 (5th Cir. 1986).

In addition, while I do not dissent with respect to the refusal to admit Mr. Ihm's expert testimony that 99 percent of U.S. currency is drug-contaminated, because such opinion was based upon unreliable methodology, other courts have recognized similar expert testimony in numerous forfeiture cases. See eg. United States v. $53,082.00 in U.S. Currency, 985 F.2d 245, 250, note 5 (6th Cir. 1993) (indication that as much as 96 percent of currency has narcotics contamination); United States v. Carr, 25 F.3d 1194, 1214-1218 (3rd Cir. 1994) (Becker, J., concurring in part and dissenting in part) cert. denied, 513 U.S. 1086 (1995); United States v. $639,558.00 in U.S. Currency, 955 F.2d 712, 714, note 2, (D.C. Cir. 1992) (referencing expert testimony that 90 percent of currency contains sufficient quantities of cocaine to alert a trained dog).

For all of the above reasons I dissent from Part A of the majority opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.