UNITED STATES of America, Plaintiff–Appellee,

v.

Anthony INTINI, III, Defendant–Appellant.

No. 00–2906.

United States Court of Appeals, Seventh Circuit.

Submitted June 12, 2001.*

Decided Sept. 5, 2001.

---

* The district court released Intini on bond pending appeal on the condition that he begin paying restitution. Intini intended to orally argue this appeal pro se, but he failed to make the required payment, and the district court thus revoked his bond. The motions panel

Before MANION, DIANE P. WOOD, and WILLIAMS, Circuit Judges.

### ORDER

The district court revoked Anthony Intini's federal probation after finding that he willfully failed to make restitution to one of his crime victims. Intini appeals, arguing that the district court lacked jurisdiction to revoke his probation, violated his due process rights by delaying his revocation hearing for over five years, and erroneously concluded that his failure to make restitution was willful. We affirm.

Intini is a former attorney who was disbarred by the State of Illinois in 1986 for committing crimes involving moral turpitude. In 1990 a federal grand jury indicted him on nine counts of mail fraud stemming from his embezzlement of settlement funds owned by former clients Eleanor Hurt and Stanley Golab. Intini pleaded guilty to two of the counts, and was sentenced on one to a three-year term of imprisonment and on the other to a consecutive two-year term of probation. As a condition of Intini's probation, the district court ordered that he restore $250,000 to Hurt and $35,000 to Golab. Intini reported to prison on October 11, 1991, and, with accumulated good-time, was released on October 29, 1993.

During Intini's criminal proceedings Hurt sued Intini for professional malpractice in Illinois court and won a $700,000 judgment. She attempted to enforce the

denied Intini release pending appeal and vacated oral argument. Thus, the appeal is submitted on the briefs and the record.

judgment by taking title to his Oak Brook, Illinois, home, but Intini put up a fight. First, he twice attempted to vacate the judgment. The state court rejected both attacks, and, realizing that Intini was unlikely to voluntarily surrender the property, delivered itself the deed to Intini's home to Hurt. Next, Intini filed for bankruptcy to automatically stay enforcement of the judgment. Hurt succeeded in getting the automatic stay lifted, but Intini still refused to surrender the house. Hurt then obtained a forcible entry and detainer order from the state court, and the Sheriff seized Intini's house and delivered possession to Hurt. Hurt, who was 80 years old at the time, intended to sell the house to satisfy part of the judgment. Unfortunately for her, the house was in extremely poor physical condition, and its title was clouded by tax and homeowner association liens. Hurt's real estate agent told her that the house was unmarketable. Hurt borrowed a substantial amount of money from her attorneys for renovations and incurred additional legal fees removing the liens. Once the house was in saleable shape and unencumbered, Hurt sold it for $360,000. But after deducting commissions, loan payments, and attorneys' fees, she netted just $129,000.

In August 1995, shortly after Hurt sold the house, Intini petitioned the district court to declare his restitution obligation satisfied. The government opposed the motion, contending that the proceeds from the sale of the house, even if deemed partial satisfaction of Intini's order of restitution to Hurt, were not enough to satisfy the entire amount. The government also pointed out that Intini had made no restitution to Golab. The district court conducted a hearing on October 10, 1995. There, Intini admitted making no restitution to Golab, which prompted an order directing him to show cause why his probation should not be revoked or modified for nonpayment. The court set the revocation hearing for November 8, 1995, and warned Intini that if he failed to appear he would be arrested. The government was concerned, however, that Intini's probationary period might expire by the end of October 1995, and requested that the district court schedule the hearing in October. The district court declined, noting that its Rule to Show Cause would toll the running of Initini's probation.

At the November 8 hearing, Intini announced that he had recently placed $35,000 in his attorney's client trust account for immediate payment to Golab. Intini told the court that his "business partner," Alan Little, had given him the money to pay Golab. Without directing Intini to do anything with the money, however, the district court told the government to proceed with the hearing. Kim Masini, Intini's probation officer, testified first. Masini reported that to the best of her knowledge Intini had made no restitution to Golab and none to Hurt apart from the proceeds of the house. Intini had told her that following his release from prison he worked for Angelic Creations, a doll business his wife operated from a storefront below her home. Although Intini claimed that his wife largely supported him and that he did not receive a formal income or regular paycheck, he told Masini that on balance his wife gave him about $580 a month from her business income, which he estimated was equivalent to a minimum-wage salary. Intini also had disclosed to Masini that he had an "interest" in Waterford Development Corporation, a real estate development company, but Masini did not know the extent of Intini's interest in Waterford.

The government then proffered that Intini's unreported interest in Waterford was a controlling block of stock worth approximately $6,000,000. Additionally, Ariel

Weissberg, Intini's attorney, had told government investigators in a September 1995 letter that Intini had successfully obtained mortgages exceeding $5,000,000 on a parcel of real estate owned by Waterford. The government asserted that it would defy common sense for a bank to lend that much money to a man working for minimum wage in a doll shop, and accordingly argued that Intini was hiding assets from Hurt and Golab. The government also alleged that in 1995 Intini purchased an expensive car but had not disclosed that information to his probation officer.

Intini then testified. He first described Alan Little as a Waterford shareholder who sought Intini's help as an independent contractor in an unrelated real estate venture. Rather than paying Intini a fee for his consulting services, Little instead agreed to help Intini make restitution by giving him $35,000 to satisfy his obligation to Golab. Intini stated that before the revocation hearing his probation officer refused the tender of the money because he could not verify that it came from a legitimate source. Regarding his interest in Waterford, Intini told the court that he purchased 700 of the 900 outstanding shares of Waterford's stock in August 1995 from six shareholders for $1.00 per share in August 1995, but the board of directors and minority shareholders refused to call a meeting in order to prevent Intini from taking control of the board. Intini had directed Weissberg to file a lawsuit against Waterford on his behalf to compel it to hold an annual meeting. Regarding his alleged purchase of a car, Intini told the court that Alan Little, who apart from his involvement with Waterford also ran a car dealership with his brother Gary, had lent him a 1993 Jeep, and that the Jeep was titled in Little's name.

Next, Intini testified that it was his belief that his restitution obligation had been completely satisfied by the proceeds from Hurt's sale of his house. In his motion to declare his restitution order satisfied, Intini declared that the state court order granting the $700,000 malpractice judgment to Hurt had directed her to give Golab his share of the restitution from whatever assets she could find to satisfy the judgment. Intini also claimed that he owed Hurt nothing because she sold his former house for $10,000 more than his order of restitution, and that Hurt's expenses towards making the house marketable should not be set off against the selling price of the house.

But on cross-examination Intini begrudgingly admitted that his declaration in his motion was a lie: Golab was neither a party to Hurt's malpractice lawsuit, nor was his name mentioned in the judgment. (He blamed it on his attorney.) The government next asked Intini how he was able to find $700 to purchase the Waterford stock when he claimed to earn only minimum wage and received no regular paycheck. Intini took this opportunity to "clarify" his earlier testimony by stating that he actually purchased the stock from the six shareholders for $1.00 *per shareholder*, or for a total of $6.00. At this point Weissberg became convinced that he had a conflict of interest due to his representation of Intini in the Waterford litigation and moved to withdraw. The district court reluctantly granted the motion, and at Intini's request continued the hearing so that Intini could retain new counsel. But before leaving the courtroom Intini asked the judge to order Weissberg to tender the $35,000 in his trust account to the probation office for payment to Golab. The district court declined to do so, reminding Intini that the money in Weissberg's client trust account belonged to him not Weissberg, and that he was free to direct Weissberg to disburse the money.

Intini did not direct Weissberg to tender the $35,000 to the government, and, inexplicably, Intini's revocation hearing did not resume for six months. On May 21, 1996, the district court, without hearing further testimony, issued an order finding that Intini had not made full restitution to either Hurt or Golab. The court, however, took under advisement the question whether to revoke Intini's probation. Since Intini had told the court at the November 1995 hearing that he was ready to give $35,000 to Golab, the district court ordered him to tender the money to his probation officer. Intini's probation officer then orally directed Intini to tender the money to the clerk of the district court by June 24, 1996, but Intini did not comply. The probation officer gave Intini an additional two weeks to pay, but Intini again failed to obey the command, so the district court ordered him to show cause why his probation should not be revoked for failing to comply with the order.

In August 1996 Intini appeared before the district court claiming that he no longer had the money to repay Golab but that he and his wife were attempting to arrange a loan to pay Golab. Two months later, however, Intini still had not complied. At another court appearance he told the judge that he and his wife were either selling or taking out a second mortgage on her house and that a check for $35,000 would be tendered to the government once the closing occurred. The district court reminded Intini that his restitution obligation was not limited to Golab. On November 19, 1996, Intini tendered $10,000 to the clerk of the district court for payment to "Stanley Golab-only." On that same date, however, Intini told the judge that the closing on his wife's house did not take place because its title was not marketable, and that he was attempting to quiet title and obtain the rest of money he owed Stanley Golab.

For the next 21 months, status hearings were frequently set but always postponed. In February 1998, Intini appeared again before the district court to explain why he still had not made any additional restitution. This time his excuse was that a defective halogen lamp had caused a fire in his wife's house and as a consequence he was unable to obtain a mortgage. The government asked the district court to immediately revoke Intini's probation. The district court declined, instead offering Intini one additional opportunity to make full restitution. The district court set an evidentiary hearing for April 1998 to resolve the matter, but later rescheduled the hearing for June 1998. The hearing did not take place. Citing its engagement in a jury trial, the district court referred the matter to the magistrate judge two months later to determine whether Intini had willfully refused to make restitution.

Sending the remainder of Intini's revocation hearing to the magistrate judge did not move things along, for Intini's hearing did not resume before the magistrate judge for over a year. In November 1999, then four years after the district court commenced revocation proceedings against Intini, the magistrate judge convened the hearing. The government again presented the testimony of probation officer Masini. She told the court about recently learning that in 1996, during the series of postponements, Intini had been involved in new criminal activity and actually spent time in state custody. Jim Wojtas, a DuPage County, Illinois, probation officer, testified that Intini had been convicted of fraud and practicing law without a license, served 60 days in a work-release program, and as part of his sentence was ordered to serve probation and pay restitution to the victim.

Douglas Lenhart, an FBI special agent investigating Intini's business affairs, also

testified. Lenhart had interviewed Alan Little, who told him that he hired Intini as a consultant in a real estate project, and as a fee for his services gave Intini the $35,000 intended for Stanley Golab. Little also told the agent that he paid Intini an additional $15,000 by check payable to Angelic Creations. Intini instructed Little to pay him in this fashion so that none of Little's payments to Intini would appear in Intini's name. Lenhart also interviewed Ariel Weissberg. Weissberg told Lenhart that Intini gave him a cashier's check for $35,000 as a retainer in his civil suit against Waterford, and an additional $35,000 to enable Weissberg to purchase a judgment on Intini's behalf. Weissberg confirmed that he used the money as Intini instructed. Lenhart then asked Weissberg what had become of the $35,000 earmarked for Golab. Weissberg told him that from the $35,000 Intini instructed him to give $10,000 to Indiana University and $15,000 to Angelic Creations. Weissberg told Lenhart that he later received a $3,000 check drawn on Angelic Creations's business account. Weissberg deposited the check in his client trust account, transferred the money to his general business account, and ultimately wrote a $3,000 check from that account payable to Intini's wife.

In the course of his investigation Lenhart also interviewed Alan Little's brother Gary. Gary Little confirmed that Intini was employed by his brother Alan to arrange financing for his car dealership. Gary was aware that Alan had paid Intini at least $35,000, but said he thought that $15,000 of that amount had been a loan that Intini never paid back. Gary Little also knew that Alan had made additional payments to Intini totaling $4,300, and a payment to Angelic Creations of $3,287.40. Finally, Gary discussed Intini's alleged automobile purchase. Gary stated that his brother "turned over" a company car, a

$23,000 Jeep, to Intini. After Intini fell behind on his car payments, Alan attempted to refinance the car for Intini. On an October 1995 financing application Intini listed his wife as the registered owner of the vehicle, his job as "supervisor," and his income as $50,000. Intini's wife was a joint applicant and listed her own income as $52,000. The government tendered documents to the district court that it claimed showed that the October 1995 "refinancing" was in fact a sale.

The government rested, and the magistrate judge continued the hearing until the following month. By agreement of the parties, however, the hearing was continued until January 2000. On the eve of the final portion of the hearing, Intini moved to dismiss. He asserted that the district court lacked jurisdiction to revoke his probation because the government had never filed a formal motion to revoke, nor had any court issued a warrant for his arrest, before Intini's probation expired. The magistrate judge took the motion under advisement, and Intini agreed to continue the hearing for yet another month. When the hearing finally reconvened in late February 2000, Intini rested without presenting any witnesses.

On April 20, 2000, the magistrate judge issued his Report and Recommendation to the district judge. The magistrate judge first recommended denying Intini's motion to dismiss on the ground that the district court's October 10, 1995 Rule to Show Cause order was issued prior to the expiration of Intini's probationary term and sufficed to toll its running. The magistrate judge next found that, despite Intini's claim that he lacked the resources to pay restitution, in 1995 Intini had paid his attorney $35,000 as a fee with funds from his wife's business. Additionally, the magistrate found that Alan Little had twice paid Intini $35,000 in 1995, before revoca-

tion proceedings commenced. Although at least one payment was earmarked for Stanley Golab, Intini later spent the money elsewhere. The magistrate judge further found that Intini had purchased the Jeep from Alan Little in October 1995, and at the time of the purchase had declared income of $50,000 on the financing documents. In sum, the magistrate judge concluded that Intini had been unable to make full restitution to Hurt and Golab, but had been capable of paying at least $35,000 in 1995, yet did not. Accordingly, the magistrate judge recommended that the district court find that Intini willfully failed to comply with his order of restitution.

Neither party objected to the Report and Recommendation. On May 9, 2000, the district court adopted it and found that Intini had violated his probation. At a July 12, 2000, sentencing hearing, Intini announced again that he possessed $25,000 that he was ready to give to Golab, but stated that he was unwilling to pay if the district court was considering revoking his probation in any event. The district court revoked Intini's probation, sentencing him to a term of 366 days. The court also granted Intini release pending appeal, but conditioned his release on immediate payment by certified check of $25,000 to Stanley Golab and posting of a $4,500 bond. Intini instead tendered an uncertified check, and ultimately the district court revoked his bond.

■ Intini first argues that the district court lacked jurisdiction to revoke his probation because neither the court nor the government commenced formal revocation proceedings against him before his probationary term expired. We conduct this jurisdictional inquiry *de novo*. *See United States v. $506,231 in U.S. Currency*, 125

F.3d 442, 446 (7th Cir.1997); *United States v. Morales–Alejo*, 193 F.3d 1102, 1104 (9th Cir.1999). Intini asserts that his consecutive two-year term of probation began to run on the day following his release from prison on October 29, 1993, so his probation formally expired by October 29, 1995. Since the government did not move in the district court to revoke his probation until November 1995, Intini contends that he was in the clear and that the government waited too long to revoke his probation.

The government disagrees and contends that Intini's probation continued into 1996, and that Intini miscalculated the beginning and end of his probationary period. Under the rules in place at the time Intini was sentenced, inmates such as Intini who were released before the expiration of their maximum prison term due to the accumulation of good-time credit were deemed released on parole until the expiration of their maximum term of imprisonment, less 180 days. *See* 18 U.S.C. § 4164 (repealed);[1] *Martin v. Luther*, 689 F.2d 109, 111 (7th Cir.1982); *United States v. Lewis*, 211 F.3d 932, 934 (5th Cir.2000); *United States v. Flynn*, 49 F.3d 11, 14–15 (1st Cir.1995); *United States v. Einspahr*, 35 F.3d 505, 507 (10th Cir.1994). Since Intini served just over two years of a three-year prison term and was released on October 29, 1993, the government argues that Intini was on parole until April 11, 1994, 180 days before the expiration of his maximum prison sentence. And because his probationary term was consecutive to his prison term, Intini's probation began on April 12, 1994 and ended April 11, 1996, so revocation proceedings commenced in 1995 were timely.

---

1. *See* Pub.L. 98–473, Title II §§ 218(a)(4), 98 Stat. 2027 (Oct. 12, 1984). Repeal of this provision was effective November 1, 1987, and applied only to offenses committed after that date. *See* Pub.L. 98–473, § 235(a)(1).

There is some support for Intini's argument that his probation started once he was released from prison. *See* 18 U.S.C. § 3564(b). But we need not decide who is correct because we conclude that Intini's revocation proceedings were timely commenced under either party's view. Formal probation revocation proceedings began on October 10, 1995 when the district court directed the government to order Intini to show cause why his probation should not be revoked and ordered him to appear for a revocation hearing. *See United States v. Schimmel*, 950 F.2d 432, 435–36 (7th Cir. 1991); *United States v. Bazzano*, 712 F.2d 826, 835 (3d Cir.1983) (en banc).

█ Intini next contends that the district court lacked jurisdiction to revoke his probation because it impermissibly delayed his revocation proceedings and held his revocation hearing long after his probationary period would have terminated. Although the running of Intini's probationary term did not immunize him from answering for violations that occurred during the term, 18 U.S.C. § 3565(c); *United States v. Jimenez–Martinez*, 179 F.3d 980, 981 (5th Cir.1999); *United States v. Barton*, 26 F.3d 490, 491–92 (4th Cir.1994); *United States v. Neville*, 985 F.2d 992, 997 (9th Cir.1993), the five years it took the district court to revoke Intini's two-year probation term concerns us and requires further discussion.

As a general rule, once probable cause to believe that a probationer has violated the terms of his probation is established, a revocation hearing, unless waived, "shall be held within a reasonable time." Fed. R.Crim.P. 32.1(a)(2); *Barton*, 26 F.3d at 491–92. We apply the framework of a criminal defendant's Sixth Amendment speedy trial right in determining whether a delay is constitutionally significant. *United States v. Rasmussen*, 881 F.2d 395, 398 (7th Cir.1989); *United States v. Scott*, 850 F.2d 316, 319–20 (7th Cir.1988); *United States v. Williams*, 787 F.2d 1182, 1184 (7th Cir.1986). We balance the length of the delay, the reason for the delay, the probationer's assertion of his right to a prompt hearing, and the prejudice to the probationer. *Rasmussen*, 881 F.2d at 398 (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).

The delay in this case was unreasonable. *See Scott*, 850 F.2d at 320 (thirteen-month delay "gives us pause"); *United States v. Hill*, 719 F.2d 1402, 1405 (9th Cir.1983) (two and one-half year delay unreasonable). We see nothing exceptionally complex about this case requiring almost five years to resolve it.[2] Nevertheless, Intini's due process rights were not violated. Intini agreed to many of the continuances, and caused some of the delay himself by defying orders from his probation officer and on one occasion failing to appear for a hearing. Part of the delay can also be attributed to Weissberg's foreseeable need to withdraw at the outset of these hearings. Since the issue in the proceedings was whether Intini failed to pay restitution and, by deduction, whether he was hiding assets from the government, Weissberg, who represented Intini in his lawsuit against Waterford's board of directors, ought to have known that he had a poten-

---

**2.** It is not clear to us why the government did not pursue this matter more seriously. As discussed above, the government presented evidence that Intini committed several crimes during his revocation proceedings. Even if Intini cannot be compelled to comply with his restitutionary obligation by further threat of probation revocation, other remedies remain available to the government, *see* 18 U.S.C. § 3613A, including enforcing the unpaid restitution order as if it were a civil judgment, 18 U.S.C. § 3613(a), treating it as a tax lien under the Internal Revenue Code, 18 U.S.C. § 3613(b), or prosecuting Intini for willfully failing to pay, 18 U.S.C. § 3615.

tial conflict of interest. But by noting Intini's part in dragging out these proceedings, we do not mean to lessen both the government's and the district court's responsibility for the delay. For instance, in one ten-month period no activity at all was entered on the docket. In the end, however, Intini never spoke up, and although we generally do not presume a waiver from a silent record, his failure to demand quick resolution can be weighed in determining whether his speedy trial right was violated. *See Barker,* 407 U.S. at 525–28.

Moreover, unreasonable delay alone does not violate due process. The speedy trial right (and by analogy the reasonable time requirement) protects against oppressive pretrial incarceration, anxiety and concern of the accused, and impairment of the defense. *Id.* at 532. Thus, Intini would have to demonstrate that the delay prejudiced his ability to contest the revocation. *Williams,* 787 F.2d at 1184; *United States v. Sanchez,* 225 F.3d 172, 175–76 (2d Cir.2000); *United States v. Throneburg,* 87 F.3d 851, 853 (6th Cir.1996); *United States v. Tippens,* 39 F.3d 88, 90 (5th Cir.1994). Intini was not incarcerated pending probation revocation, and nothing in this record suggests that he felt anxious at all. *Cf. Hanahan v. Luther,* 693 F.2d 629, 635 (7th Cir.1982) (felon on parole cannot be said to have as high a level of anxiety as an unconvicted defendant). More importantly, he does not claim that he was unable to marshal witnesses in his defense. *Cf. United States v. Chaklader,* 987 F.2d 75, 77 (1st Cir.1993) (no prejudice where delay did not impair probationer's ability to contest revocation); *United States v. Blunt,* 680 F.2d 1216, 1219 (8th Cir.1982) (prejudice caused by unreasonable delay includes dim memories and disappearance of witnesses affecting the outcome). We are satisfied that Intini suffered no prejudice, and on balance the unreasonable delay in holding Intini's revocation hearing did not

violation his due process rights. Indeed, from what we can see, the persons prejudiced were not Intini but his original victims and the new one in 1996.

■ Intini's final argument is that the district court's conclusion that he willfully failed to pay restitution was erroneous. A probationer may not be imprisoned for failing to pay restitution unless he has the means to pay restitution yet willfully refuses to do so. *Bearden v. Georgia,* 461 U.S. 660, 668–69, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983); *United States v. Warner,* 830 F.2d 651, 656–57 (7th Cir.1987). We review the district court's decision to revoke probation for abuse of discretion. *United States v. Bennett,* 955 F.2d 23, 24 (7th Cir.1992). Intini contends that the district court's conclusion was based on his behavior after 1995 when revocation proceedings commenced; he believed that his restitution had been satisfied by Hurt's professional malpractice judgment and that the revocation proceedings had come as a surprise to him; attempted in good faith to give Golab $35,000 but was thwarted in his effort by the district court; and was unaware that he was required to make payments because the district court did not set up a payment schedule. These claims are meritless. In addition to the evidence of Intini's 1996 fraud and unlicensed practice of law convictions and other troublesome activities, the government presented sufficient evidence that before October 1995 Intini had sufficient assets to make restitution, yet willfully did not. Specifically, the district court found that in 1995 before revocation proceedings commenced Intini gave Weissberg a cashier's check for $15,000 naming himself as remitter, paid Weissberg an additional $20,000 with a check drawn from his wife's business account, and purchased a $23,000 automobile. The record supports the district court's conclusion that Intini possessed the

money when the show cause order issued and did not pay it over as restitution.

Intini's purported belief that his restitution to Hurt and Golab was satisfied by Hurt's sale of his former house is irrelevant. Intini merely rehashes his claim that it was Hurt's responsibility to pay Golab. In the district court Intini falsely declared that the state court had ordered Hurt to pay Golab from her judgment. Now Intini asserts for the first time that his restitutionary order created a lien in Golab's favor on Hurt's judgment, so that Hurt was obligated to pay Golab $35,000 from the proceeds of the sale of Intini's house. Intini points to no authority supporting this proposition, and in any event, as the government points out, even if Golab had a claim to a portion of Hurt's judgment, that claim does not alter the fact that it was and still is Intini's obligation to make restitution, not Golab's or Hurt's responsibility to find it. We are similarly unpersuaded by Intini's attempt to blame the district court for not issuing an additional order compelling him to pay over the $35,000. Intini has been under a court order to make restitution to Golab and Hurt since 1991. That order remains in effect, so Intini was and is under a continuing obligation to comply and did not need an additional court order to turn over the money.

Finally, Intini's claim that he did not know he was supposed to make periodic restitution payments because the district court did not set up a payment schedule for him is frivolous. The district court was under no obligation to set up a payment schedule for Intini, 18 U.S.C. § 3572(d), and Intini himself insisted at the outset of his probation that he was prepared to make full restitution and did not need a payment schedule. And by not setting up a payment schedule, Intini's restitutionary obligation was due and payable immediately. 18 U.S.C. § 3579(d)(1).

The judgment of the district court is AFFIRMED.